## UNITED STATES v. CLARK.

*(Circuit Court, E. D. Michigan. August 1, 1887.)*

1. CIRCUIT COURT—MILITARY RESERVATION.
     The circuit court has jurisdiction of a homicide committed by one soldier upon another within a military reservation of the United States.

2. HOMICIDE—MILITARY GUARD—ESCAPE OF PRISONER—JUSTIFICATION.
     If a homicide be committed by a military guard without malice, and in the performance of his supposed duty as a soldier, such homicide is excusable, unless it was manifestly beyond the scope of his authority, or was such that a man of ordinary sense and understanding would know that it was illegal.

3. SAME—SCOPE OF AUTHORITY.
     *It seems* that the sergeant of a guard has the right to shoot a military convict if there be no other possible means of preventing his escape.

4. SAME—FELONIES—MISDEMEANORS.
     The common-law distinction between felonies and misdemeanors has no application to military offenses.

5. SAME—FORMER JEOPARDY—MILITARY COURT.
     While the finding of a court of inquiry, acquitting the prisoner of all blame, is not a legal bar to a prosecution, it is entitled to weight as an expression of the views of the military court of the necessity of using a musket to prevent the escape of the deceased.

*(Syllabus by the Court.)*

On complaint before the district judge, as committing magistrate, for murder upon the Fort Wayne military reservation.

Arthur Stone, the deceased, was a private soldier of Company I, Twenty-third regiment, United States infantry, and, at the time of the homicide, was under conviction of a court-martial for "conduct prejudicial to good order and military dicipline," and had been sentenced " to be dishonorably discharged the service of the United States, forfeiting all pay and allowances due or to become due, and to be confined at hard labor, at such military prison as the reviewing authority may direct, for two years." The prisoner was the sergeant of the guard having him in custody at the time. On the eleventh day of July, at "retreat," all the prisoners in the guard-house, six in number, had been taken out of the guard-house for roll-call and inspection, and were standing in a line, with their backs to the guard-house, in charge of a squad of armed soldiers. As Lieut. Wieton, officer of the day, and the prisoner, the sergeant of the guard, were entering the guard-house to inspect it, and just as the prisoner was crossing the threshold of the outer door, deceased, who was standing at the end of the line of prisoners, broke from the ranks, ran around the corner of a fence in line with the guard-house, and towards the public highway in front of the military reserve, from which it was separated by a board fence about six feet in height. As he left the ranks, an outcry was raised, and the quartermaster sergeant, who happened to see the escape, and a private by the name of Duff, started in pursuit, calling upon him to halt; the sergeant adding, "There is a load after you." Clark, hearing the outcry, turned and seized a cartridge from his box, hastily loaded his musket, and ran around the guard-house in the direction which Stone had taken. At this time Stone was about

30 yards ahead of his nearest pursuer, Duff, who did not seem to be gaining upon him, and stood little if any change of overtaking him before he could gain the street. Just as he was crossing a military road within the reserve, and about to leap a rail fence parallel with this road, and about 35 yards from the outer fence, and about 80 yards from the guard-house, Clark fired, and hit Stone in the back just above the hips, inflicting a wound from which he died in the course of the evening. No ill feeling existed between the men; in fact they had always been upon very friendly terms, and it was at least doubtful whether Clark knew it was Stone when he fired.

*C. P. Black*, Dist. Atty., *Chas. T. Wilkins*, Asst. Dist. Atty., and *Levi T. Griffin*, for the prosecution.

*Asa B. Gardner*, Judge Adv. Gen., *Sylvester Larned*, *Allen Fraser*, and *James C. Smith*, for the defense.

BROWN, J. In view of the fact that this was a homicide committed by one soldier, in the performance of his alleged duty, upon another soldier, within a military reservation of the United States, I had at first some doubt whether a civil court could take cognizance of the case at all; but, as crimes of this nature have repeatedly been made the subject of inquiry by civil tribunals, I have come to the conclusion that I ought not to decline to hear this complaint. Indeed, it is difficult to see how I could refuse to do so without abdicating that supremacy of the civil power which is a fundamental principle of the Anglo-Saxon polity. While there is no statute expressly conferring such jurisdiction, there is a clear recognition of it in the fifty-ninth article of war, which provides that "when any officer or soldier is accused of a capital crime, or of any offense against the person or property of any citizen of any of the United States, which is punishable by the laws of the land, the commanding officer, and the officers of the regiment, troop, battery, company, or detachment to which the person so accused belongs, are required, (except in time of war,) upon application duly made by or in behalf of the party injured, to use their utmost endeavors to deliver him over to the civil magistrate, and to aid the officers of justice in apprehending him and securing him, in order to bring him to trial." This article makes no exception of crimes committed by one soldier upon another, nor of cases where there is concurrent jurisdiction in the military courts. Tytler, in his work upon Military Law, says:

"The martial or military law, as contained in the mutiny act and articles of war, does in no respect supersede or interfere with the civil or municipal laws of the realm. * * * Soldiers are, equally with all other classes of citizens, bound to the same strict observance of the laws of the country, and the fulfillment of all their social duties, and are alike amenable to the ordinary civil and criminal courts of the country for all offenses against those laws, and breaches of those duties."

In the case of *U. S. v. Cornell*, 2 Mason, 61, 91, Mr. Justice STORY took cognizance of a murder committed by one soldier upon another in Fort Adams, Newport harbor. The case was vigorously contested, and

the point was made that the state courts had jurisdiction of the of-
fense, but there was no claim that there was not jurisdiction in some
civil tribunal.   A like case was that of a murder committed in Fort Pu-
laski, at the mouth of the Savannah river, and tried in 1872 before Mr.
Justice Woods and Judge ERSKINE.   *U. S.* v. *Carr*, 1 Woods, 480.   No
question was raised as to the jurisdiction.   The subject of the civil re-
sponsibility of the army was very carefully considered by Attorney Gen-
eral Cushing, in *Steiner's Case*, 6 Ops. Atty. Gen. 413, and the conclu-
sion reached that an act criminal both by military and general law is
subject to be tried either by a military or civil court, and that a convic-
tion or acquittal by the civil authorities of the offense against the general
law does not discharge from responsibility for the military offense in-
volved in the same facts.   The converse of this proposition is equally
true.

2. The character of the act involved in this case presents a more seri-
ous question.   The material facts are undisputed.   There is no doubt
that the deceased was killed by the prisoner under the performance of a
supposed obligation to prevent his escape by any means in his power.
There is no evidence that the prisoner fired before the necessity for his
doing so had become apparent.   Stone was called upon several times to
halt, with a hail by the quartermaster sergeant that there was "a load
after him."   Duff, his nearest pursuer, was not gaining upon him, and
in another half minute he would have scaled the two fences between him
and the highway, and would probably have been lost in the houses that
lie on the other side of the street.   A court of inquiry, called for the
purpose of fully investigating the circumstances, was of the opinion that
if Clark had not performed his duty as efficiently as he did, by firing on
deceased, he certainly would have effected his escape; and found that
no further action was necessary in the case.   The prisoner and the de-
ceased had always been good friends, and it is at least doubtful whether
Clark recognized him at the time of firing the fatal shot.   The prisoner
has heretofore borne a most excellent reputation, was never court-mar-
tialed nor punished, and was pronounced by all the witnesses who tes-
tified upon the subject to be an exceptionally good soldier.   There is not
the slightest reason to suppose that he was not acting in obedience to
what he believed to be his duty in the premises.   There was some con-
flicting testimony as to whether he was standing or kneeling at the time
he fired, but I am not able to see its materiality.   If he was authorized
to shoot at all, he was at liberty to take such position as would insure
the most accurate aim, whether his object was to hit the deceased in the
leg or in the body.   Clark says that he aimed low, for the purpose of
merely disabling him, but, owing to a sudden descent in the ground,
the shot took effect in the back instead of the leg.   For the purpose of
this examination, however, I am bound to presume that he intended to
kill, as a man is always presumed to intend the natural and probable
consequences of his acts.   The case then reduces itself to the naked le-
gal proposition whether the prisoner is excused in law in killing the de-
ceased.

The general rule is well settled, by elementary writers upon criminal law, that an officer having custody of a person charged with felony may take his life, if it becomes absolutely necessary to do so to prevent his escape; but he may not do this if he be charged simply with a misdemeanor; the theory of the law being that it is better that a misdemeanant escape than that human life be taken. I doubt, however, whether this law would be strictly applicable at the present day. Suppose, for example, a person were arrested for petit larceny, which is a felony at the common law, might an officer under any circumstances be justified in killing him? I think not. The punishment is altogether too disproportioned to the magnitude of the offense. Perhaps, under the statute of this state, (2 How. St. § 9430,) wherein a felony is "construed to mean an offense for which the offender, on conviction, shall be liable by law to be punished by death, or by imprisonment in the state prison," the principle might still be applied. If this statute were applicable to this case, it would operate as a justification, since Stone had been convicted and sentenced to hard labor in a military prison. Under the recent case of *Ex parte Wilson,* 114 U. S. 417, 5 Sup. Ct. Rep. 935, it was adjudged by the supreme court, upon full consideration, that a crime punishable by imprisonment for a term of years at hard labor was an "infamous crime," within the meaning of the constitution.

Manifestly, however, the case must be determined by different considerations. Stone had been court-martialed for a military offense, in which there is no distinction between felonies and misdemeanors. His crime was one wholly unknown to the common law, and the technical definitions of that law are manifestly inappropriate to cases which are not contemplated in the discussion of common-law writers upon the subject. We are bound to take a broader view, and to measure the rights and liabilities of the prisoner by the exigencies of the military service, and the circumstances of the particular case. It would be extremely unwise for the civil courts to lay down general principles of law which would tend to impair the efficiency of the military arm, or which would seem to justify or condone conduct prejudicial to good order and military discipline. An army is a necessity—perhaps I ought to say an unfortunate necessity—under every system of government, and no civilized state in modern times has been able to dispense with one. To insure efficiency, an army must be, to a certain extent, a despotism. Each officer, from the general to the corporal, is invested with an arbitrary power over those beneath him, and the soldier who enlists in the army waives, in some particulars, his rights as a civilian, surrenders his personal liberty during the term of his enlistment, and consents to come and go at the will of his superior officers. He agrees to become amenable to the military courts, to be disciplined for offenses unknown to the civil law, to relinquish his right of trial by jury, and to receive punishments which, to the civilian, seem out of all proportion to the magnitude of the offense.

The articles of war, which he takes an oath, upon his enlistment, to observe, are in fact a military code of Draconic severity, and authorize harsh punishments for offenses which seem to be of a trivial nature.

Thus, by the articles of war, all the following crimes are punishable by death, or such other punishment as a court-martial may direct: Striking a superior officer; drawing or lifting up a weapon, or offering any violence, against him; or disobeying any lawful command.. Article 21. Exciting or joining in any mutiny or sedition. Article 22. Failing to use his utmost endeavors to suppress such mutiny or sedition, or failing to give information thereof to his commanding officer. Article 23. A sentinel sleeping upon his post or leaving it before he is relieved. Article 39. Occasioning false alarms in camp or quarters. Article 41. Misbehaving himself before the enemy; running away, or shamefully abandoning any post which he is commanded to defend; speaking words inducing others to do the like; casting away his arms or ammunition, or quitting his post or colors to plunder or pillage. Article 42. Compelling the commander of any post to surrender it to the enemy, or to abandon it. Article 43. Making known the watchword to any person not entitled to receive it, or giving the watchword different from that which he has received. Article 44. Relieving the enemy with money, victuals, or ammunition, or harboring or protecting an enemy. Article 45. Holding correspondence or giving intelligence to an enemy Article 46. Deserting in time of war. Article 47. Advising or persuading another to desert in time of war. Article 51. Doing violence to any person bringing provisions or other necessaries to camp or quarters of troops in foreign parts. Article 56. Forcing a safeguard in a foreign territory or during a rebellion. Article 57. Some of these articles are applicable only to a state of war, but some of them treat of offenses which may equally well be committed in time of peace. Besides these, there are a number of minor offenses punishable as a court-martial may direct, and a general and very sweeping article (No. 62) providing that all crimes not capital, and all disorders and neglects to the prejudice of good order and military discipline, shall be justiciable by a court-martial, and punishable at the discretion of the court.

Now, while the punishment in Stone's case seems to the civilian quite disproportionate to the character of his offense, as charged in the specifications, which was no more nor less than than the utterance of a malicious falsehood, when gauged by the penalties attached by congress to the several offenses contained in the articles of war, it does not seem so excessive; at any rate, it was the lawful judgment of a court having jurisdiction of his case, and it was his duty to abide by it, or pursue his remedy in the method provided by law. In seeking to escape, the deceased was undoubtedly guilty of other conduct prejudicial to good order and military discipline, and was liable to such further punishment as a court-martial might inflict. In suffering him to escape, the prisoner became amenable to article 69, and, failing to use his utmost endeavor to prevent it, was himself subject to such punishment as a court-martial might direct. Did he exceed his authority in using his musket?

I have made the above citations from the military code to show that the common-law distinction between felonies and misdemeanors is of no possible service in gauging the duty of a military guard with respect to

a soldier in the act of escaping. His position is more nearly analogous to that of an armed sentinel stationed upon the walls of a penitentiary to prevent the escape of convicts. The penitentiary—and for this purpose we may use the house of correction in Detroit as an example—may contain convicted murderers, felons of every grade, as well as others charged with vagrancy or simple breaches of the peace, and criminals of all descriptions between the two. If the guard sees one of those prisoners scaling the wall, and there be no other means of arresting him, may he not fire upon him without stopping to inquire whether he is a felon or a misdemeanant? If he prove to be a felon, he will be fully justified; if he prove to be a misdemeanant, is he therefore guilty of murder? There are undoubtedly cases where a person who has no malice in fact may be charged with malice in law, and held guilty of murder through a misapprehension of the law. Thus, if a sheriff charged with the execution of a malefactor by hanging should carry out the sentence by shooting or beheading; or, commanded to hang upon a certain day, should hang upon another day; or if an unauthorized person should execute the sentence,—it would probably be murder at common law. But these cases are an exception to the general rule, that actual malice must exist to justify a conviction for murder. While human life is sacred, and the man who takes it is held strictly accountable for his act, a reputable citizen, who certainly does not lose his character as such by enlisting in the army, ought not to be branded as a murderer upon a mere technicality, unless such technicality be so clear as to admit of no reasonable doubt. Thus, if a sentinel stationed at the gate of a fort should wantonly shoot down a civilian endeavoring to enter in the day-time, or an officer should recklessly slay a soldier for some misconduct or breach of discipline, no supposed obligation upon his part to do this would excuse so gross an outrage.

In this connection it is urged by the defense that the finding of the court of inquiry acquitting the prisoner of all blame is a complete bar to this prosecution. I do not so regard it. If the civil courts have jurisdiction of murder, notwithstanding the concurrent jurisdiction by court-martial of military offenses, it follows logically that the proceedings in one cannot be pleaded as a bar to proceedings in the other; and if the finding of such court should conflict with the well-recognized principles of the civil law, I should be compelled to disregard it. *State* v. *Rankin*, 4 Cold. 145. At the same time, I think that weight should be given, and in a case of this kind great weight, to the finding, as an expression of the opinion of the military court of the magnitude of Stone's offense, and of the necessity of using a musket to prevent his escape. I am the more impressed with this view from the difficulty of applying common-law principles to a case of this description. There is a singular and almost total absence of authority upon the subject of the power of a military guard in time of peace. But considering the nature of military government, and the necessity of maintaining good order and discipline in a camp, I should be loth to say that life might not be taken in suppressing conduct prejudicial to such discipline.

In charging the jury in *U. S.* v. *Carr*, 1 Woods, 484, Mr. Justice Woods instructed them to "inquire whether, at the moment he fired his piece at the deceased, with his surroundings at that time, he had reasonable ground to believe, and did believe, that the killing or serious wounding of the deceased was necessary to the suppression of a mutiny then and there existing, or of a disorder which threatened speedily to ripen into a mutiny. If he had reasonable ground so to believe, and did so believe, then the killing was not unlawful. * * * But it must be understood that the law will not require an officer charged with the order and discipline of a camp or fort to weigh with scrupulous nicety the amount of force necessary to suppress disorder. The exercise of a reasonable discretion is all that is required."

So, in the case of *McCall* v. *McDowell*, 1 Abb. (U. S.) 212, 218, it is said that "except in a plain case of excess of authority, where at first blush it is apparent and palpable to the commonest understanding that the order is illegal, I cannot but think that the law should excuse the military subordinate when acting in obedience to the order of his commander. Otherwise he is placed in the dangerous dilemma of being liable in damages to third persons for obedience to an order, or to the loss of his commission and disgrace for disobedience thereto. * * * The first duty of a soldier is obedience, and without this there can be neither discipline nor efficiency in the army. If every subordinate officer and soldier were at liberty to question the legality of the orders of the commander, and obey them or not as he may consider them valid or invalid, the camp would be turned into a debating school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions." It is true this was a civil case for false imprisonment, and these observations were made with reference to a question of malice which was material as bearing upon the plaintiff's right to punitory damages, as it is also a necessary ingredient in the definition of murder.

The question of the civil responsibility of a naval officer (and his criminal responsibility seems to be the same) was considered by the supreme court in *Wilkes* v. *Dinsman*, 7 How. 89, which was an action of trespass against Commodore Wilkes for causing the plaintiff to be whipped and imprisoned for disobedience of orders, near the Sandwich islands. In discussing the responsibility of the commanding officer of a vessel of war Mr. Justice Woodbury observed:

"In respect to those compulsory duties, whether in re-enlisting or detaining on board, or in punishing or imprisoning on shore, while arduously endeavoring to perform them in such a manner as might advance the science and commerce and glory of his country, rather than his own personal designs, a public officer, invested with certain discretionary powers, never has been, and never should be, made answerable for any injury, when acting within the scope of his authority, and not influenced by malice, corruption, or cruelty. * * * The officer, being intrusted with a discretion for public purposes, is not to be punished for the exercise of it, unless it is first proved against him, either that he exercised the power confided to him in cases without his jurisdiction, or in a manner not confided to him, as, with malice, cruelty or willful oppression, or, in the words of Lord Mansfield, that he exercised

it as if 'the heart is wrong.' In short, it is not enough to show that he committed an error in judgment, but it must have been a malicious and willful error."

The same principle was applied in the criminal case of *Riggs* v. *State*, 3 Cold. 85. Riggs was a private soldier who had been convicted of murder in killing a man while acting under the orders of his superior officer. The court held that an order illegal in itself, and not justifiable by the rules and usages of war, so that a man of ordinary sense and understanding would know, when he heard it read or given, that the order was illegal, would afford the private no protection for a crime under such order; but that an order given by an officer to his private which does not expressly and clearly show on its face, or the body thereof, its own illegality, the soldier would be bound to obey, and such order would be a protection to him.

I have no doubt the same principle would apply to the acts of a subordinate officer, performed in compliance with his supposed duty as a soldier; and unless the act were manifestly beyond the scope of his authority, or, in the words used in the above case, were such that a man of ordinary sense and understanding would know that it was illegal, that it would be a protection to him, if he acted in good faith and without malice. As there is no reason in this case to suppose that Clark was not doing what he conceived to be his duty, and the act was not so clearly illegal that a reasonable man might not suppose it to be legal,—indeed, I incline to the opinion that it was legal,—and as there was an entire absence of malice, I think he ought to be discharged.

But, even if this case were decided upon common-law principles, the result would not be different. By the statutes of the state in which the homicide was committed, a felony is defined to be any crime punishable by imprisonment in the state's prison. Stone had been convicted of a military offense, and sentenced to hard labor in the military prison for two years, and, so far as the analogies of the common law are applicable at all, he must be considered, in a case of this kind, as having been convicted of a felony.

It may be said that it is a question for a jury, in each case, whether the prisoner was justified by the circumstances in making use of his musket, and if this were a jury trial I should submit that question to them; but as I am bound to find as a matter of fact that there is reasonable cause to believe the defendant guilty, not merely of a homicide, but of a *felonious* homicide, and as I would, acting in another capacity, set aside a conviction, if a verdict of guilty were rendered, I shall assume the responsibility of directing his discharge.