## In re FAIR et al.

(Circuit Court, D. Nebraska. March 23, 1900.)

1. COURT-MARTIAL—JUDGMENT—BAR TO CIVIL PROSECUTION.
   The finding and judgment of "Not guilty" by a military court-martial is not a bar to the prosecution for the same act by the civil authorities.

2. UNITED STATES ARMY—ORDERS OF OFFICERS—PROTECTION TO PRIVATE.
   An order given by a military officer to his private should be obeyed by the private, and will be his full protection in a criminal prosecution, unless the illegality of such order is so clearly shown on its face that a man of ordinary sense and understanding would know when he heard it read or given that the order was illegal.

3. CRIMINAL LAW—FEDERAL AND STATE JURISDICTION.
   The government of the United States and of a state, though exercised within the same territory, occupy different planes, and the criminal laws of the one have no application to acts performed under the authority of the other in respect to matters solely within its control.

4. UNITED STATES ARMY—REGULATIONS.
   Laws, rules, and regulations for the efficiency and discipline of the army of the United States are matters vested by the constitution solely in the general government.

5. CRIMINAL LAWS—ACTS OF UNITED STATES AGENTS—JURISDICTION.
   An officer or agent of the United States who does an act which is within the scope of his authority as such officer or agent cannot be held to answer therefor under the criminal laws of another and different government.

6. ARMY OFFICER—PERFORMANCE OF DUTIES.
   The care, judgment, and discretion which should be exercised by an officer of the United States in the performance of his duty as such officer are not to be measured by the criminal laws of a state.

7. SAME—LIABILITY.
   When an officer, in the performance of his duty under the laws of the United States, exceeds his authority, he may be sued in the state courts by any person injured by reason thereof, but when the act was done in good faith, and without malice, he is not liable to a criminal prosecution in such courts.

8. HABEAS CORPUS—REVIEW—DETERMINATION—ACTS OF SOLDIER.
   While a United States court will not, in a habeas corpus proceeding by an officer of the United States, examine the evidence for the purpose of determining whether he should be found guilty or innocent, yet the court may and should examine the evidence for the purpose of determining whether the act alleged to be criminal was done while in the performance of his duty as such officer.

9. SAME.
   When an officer of the United States is held in custody by the process of a state court for an act done within the authority conferred upon him by the laws of the United States, the United States government may protect itself by procuring the release of such officer through its judicial department.

(Syllabus by the Court.)

W. S. Summers, U. S. Atty., and S. R. Rush, Asst. U. S. Atty., for petitioners.

C. J. Smyth, Atty. Gen., and James Hassett, Co. Atty., for respondent.

MUNGER, District Judge. Samuel Morgan, under charge of having deserted from Troop A of the 8th cavalry, United States army, on

the 7th day of September, 1898, was held as a prisoner at Ft. Crook, Neb., on the 17th day of November, 1899. John S. Pryor, a private in the 10th infantry, was, on said date, a guard over said Morgan. Morgan on said day, with another prisoner named Deacon, made an assault on the guard, Pryor, knocking him down, kicking him when down, dismantled the gun of the guard, and attempted escape by flight. William M. Simpson, a sergeant of Company M, 10th infantry, who at the time was sergeant of the guard, called upon John S. Fair, a corporal, and Henry H. Jockens, a private, both members of Company M, 10th infantry, and who were on guard duty on said day, to pursue and arrest Morgan and Deacon. The order, as given, was in substance as follows: "Pursue the prisoners. If you sight them, and are positive it is the right party, halt them; and, if they do not halt, halt them a second time; and, if they do not halt, then fire upon them, and fire to hit them." Fair and Jockens pursued the fleeing prisoners through fields and timber until reaching the village of La Platte, some three miles from Ft. Crook, having in the meantime lost sight of them. On arriving at La Platte, Corp. Fair made inquiry to ascertain if there was a marshal, constable, or other peace officer there, and found there was none. He then called up, by telephone, Lieut. Welch, at Ft. Crook, who was the officer of the day, reported where he was, and his belief that the prisoners were in that vicinity. Lieut. Welch directed him to notify the civil authorities, and was informed by Fair that he had ascertained there were none there. A few minutes later, while Fair and Jockens were standing in the highway making inquiry for the prisoners of three persons who had just driven up, the prisoner Morgan passed along on the opposite side of the highway. It being the dusk of evening, and Morgan dressed in civilian clothing, they were not positive of his identity, but called upon him to halt, to which no attention was paid, but Morgan continued at a rapid walk. He was commanded the second time to halt, whereupon, he turned his face towards them, and asked, "What in hell do you want?" Corp. Fair responded, "We want you to halt." Morgan then started on a run, assuming a stooping posture. He was again commanded to halt, but continued to run. Fair and Jockens had, in the meantime, advanced towards him some 30 or 35 steps. Morgan continuing to run, Corp. Fair gave the command to fire. He and Jockens both fired at Morgan, who was hit, and died some five minutes thereafter. For the killing of Morgan, Corp. Fair and Private Jockens were both tried before a general court-martial, convened at Ft. Crook, on the charge of "manslaughter, to the prejudice of good order and military discipline," on which trial they were found not guilty. Thereafter a complaint in due form was made before the county judge of Sarpy county, Neb., charging both Fair and Jockens with the crime of murder in the killing of Morgan. They were duly arrested, an examination had by the county judge, and each held for trial in the district court of Sarpy county, bail being fixed by the county court in the sum of $1,000, which failing to give, they were committed to the custody of the sheriff of the county. Fair and Jockens have petitioned this court for their release, claiming their imprisonment is without authority of law.

The principal question to be determined is, has the state court, within and for the county of Sarpy, Neb., jurisdiction to try petitioners for such killing of Morgan as a violation of the laws of the state. If the killing of Morgan was an act violative of the laws of the state, then the state court has jurisdiction, and the petitioners must be remanded to the custody of the sheriff. If, on the other hand, such killing of Morgan was not a violation of the laws of the state, then the state court is without jurisdiction, and the petitioners should be discharged.

Two principles of law discussed on the hearing and applicable to the case are so well and firmly established that no extended citation of authorities is necessary in support thereof. They are—First, that the trial and acquittal of petitioners by the court-martial is not a bar to an inquiry and prosecution by the proper civil authorities (Coleman v. Tennessee, 97 U. S. 506, 24 L. Ed. 1118; U. S. v. Clark (C. C.) 31 Fed. 710); second, that an act done by an officer or agent of the United States in and about a matter solely within federal control, and in pursuance of an authority given by the laws of the United States, is not an offense against the laws of the state (Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55). Neither can it be denied that, when an officer or agent of the United States is held in custody by the process of a state court for an act done within the authority conferred upon him by the laws of the United States, the United States government may protect itself by procuring the release of such officer through its judicial department. As was said by Justice Strong in Tennessee v. Davis:

"The general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers. It can act only through its officers and agents, and they must act within the states. If when thus acting, and within the scope of their authority, those officers can be arrested, brought to trial in a state court for an alleged offense against the law of the state, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection,— if their protection must be left to the action of the state court,—the operations of the general government may at any time be arrested at the will of one of its members. * * * We do not think such an element of weakness is to be found in the constitution. The United States is a government with authority extending over the whole territory of the Union, acting upon the states and upon the people of the states. While it is limited in the number of its powers, so far as its sovereignty extends it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the constitution, obstruct its authorized officers against its will, or withhold from it for a moment the cognizance of any subject which that instrument has committed to it."

Writing for the court in Osborn v. Bank, 9 Wheat. 865, 6 L. Ed. 234, Chief Justice Marshall said:

"It is not unusual for a legislative act to involve consequences which are not expressed. An officer, for example, is ordered to arrest an individual. It is not necessary, nor is it usual, to say that he shall not be punished for obeying this order; his security is implied in the order itself. It is no unusual thing for an act of congress to imply, without expressing, this very exemption from state control, which is said to be so objectionable in this instance. The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted that all who are employed in them are protected while

in the line of duty, and yet this protection is not expressed in any act of congress. It is incidental to, and is implied in, the several acts by which these institutions are created, and is secured to the individuals employed in them by the judicial power alone; that is, the judicial power is the instrument employed by the government in administering this security."

With these observations, we now come to a consideration of the question as to whether petitioners, at the time of the shooting of Morgan, were acting within the line of their duty as soldiers in the army of the United States. The forty-seventh article of war is as follows:

"Any officer or soldier who, having received pay, or having been duly enlisted in the service of the United States, deserts the same, shall, in time of war, suffer death or such punishment as a court-martial may direct, and in time of peace, any punishment, excepting death, which a court-martial may direct."

Here we find that desertion on the part of the soldier constitutes a serious crime. Such crime, although against the United States, can be punished only by a military court. Soldiers charged with crimes shall be confined until tried by court-martial, or released by proper authority. Article of War 66.

Morgan was in confinement, charged with the crime of desertion. By making an assault upon and overpowering the guard, he attempted an escape. By the forty-eighth article, every soldier who deserts "shall be tried by a court-martial and punished, although the time of his enlistment may have elapsed previous to his being apprehended and tried." It follows, as a natural consequence, that Morgan was subject to be apprehended for the purpose of being dealt with by court-martial.

Were petitioners authorized to make the arrest of Morgan? A deserter may be arrested by a military officer, or by a noncommissioned officer, or private duly authorized to make the arrest. Davis, Mil. Law, 425; Winthr. Mil. Law, 173; Hutchins v. Van Bokkelen, 34 Me. 126. Prior to the act of October 1, 1890, no peace officer or private citizen had authority to arrest and detain a deserter from the army without the order or direction of a military officer. Kurtz v. Moffitt, 115 U. S. 487, 6 Sup. Ct. 148, 29 L. Ed. 458. In that case the court said:

"Whether it is expedient for the public welfare and the good of the army that such an authority should be conferred is a matter for the determination of congress."

Doubtless, acting upon the suggestion thus expressed in the above case, congress passed the act of October 1, 1890, the second section of which reads:

"That it shall be lawful for any civil officer having authority under the laws of the United States, or of any state, territory or district, to arrest offenders; to summarily arrest a deserter from the military service of the United States and deliver him into the custody of the military authorities of the general government." 26 Stat. 648.

It is urged on the part of the state that, even though an arrest of a deserter might lawfully have been made by military authorities prior to the act of 1890, such authority, if it existed, was taken away by such act, and that the exclusive authority to make such an arrest was vested in civil officers by reason of the maxim, "Expressio unius est exclusio alterius." To this I cannot agree. I

do not think congress, by giving permission to civil officers to make arrests of deserters, intended to take away the authority then existing to make such arrests on the part of the officers of the army, but that the act was intended to enable civil authorities to aid and assist the military in apprehending deserters. While congress might confer upon the civil authorities of the various states authority to make arrests of deserters against military law, it is equally clear that the duty to make such arrests could not be imposed by congress upon such authorities. Mr. Black, in his Interpretation of Laws (page 146), says:

"The maxim, 'Expressio unius est exclusio alterius,' is of very important, though limited, application in the interpretation of statutes. It is useful only as a guide in determining the probable intention of the legislature, and if it should be clearly apparent, in any particular case, that the legislature did not in fact intend that its express mention of one thing should operate as an exclusion of all others, then the maxim must give way."

Finding, then, that petitioners had lawful authority to apprehend Morgan, we come to a consideration of the question as to the right to shoot Morgan in the attempt to secure his arrest. And, if not, was such shooting a crime against the laws of the state? The sixty-ninth article of war imposes upon any officer who permits a prisoner to escape such punishment as a court-martial may direct. To aid military officers in the proper enforcement of the custody of prisoners, rules and orders have been publicly promulgated by the secretary of war. Such rules and orders have the force and effect of statutory law. As said by the court in U. S. v. Eliason, 16 Pet. 291, 10 L. Ed. 968:

"The power of the executive to establish rules and regulations for the government of the army is undoubted. * * * The power to establish implies, necessarily, the power to modify or repeal, or to create anew. The secretary of war is the regular constitutional organ of the president for the administration of the military establishment of the nation, and rules and orders publicly promulgated through him must be received as the acts of the executive, and, as such, be binding upon all, within the sphere of his legal and constitutional authority. Such regulations cannot be questioned or denied because they may be thought unwise or mistaken."

In paragraph 297 of the rules and orders publicly issued by the secretary of war in the Manual of Guard Duty, it is provided:

"The sentinel at the post of the guard has charge of the prisoners. He will allow none to escape or to cross his post except under proper guard. * * * If a prisoner attempts to escape, the sentinel will call, 'Halt.' If he fails to halt when the sentinel has once repeated his call, and if there be no other possible means of preventing his escape, the sentinel will fire upon him.

"The following will more fully explain the important duties of the sentinel in this connection:

"War Department, Adjutant General's Office.

"Washington, November 1, 1887.

"(Circular.) By direction of the secretary of war, the following is published for the information of the army."

Then follows a digest of Circular No. 3, issued by commander of the department of the Columbia, indorsement of approval thereof by judge advocate of the military division of the Pacific, and by the

major general in command of that division, from which the following provisions are extracted: .

"A sentinel is placed as guard over prisoners to prevent their escape, and for this purpose he is furnished a musket, with ammunition. To prevent escape is his first and most important duty. I suppose the law to be this: That a sentinel shall not use more force or violence to prevent the escape of a prisoner than is necessary to effect that object, but if the prisoner, after being ordered to halt, continues his flight, the sentinel may maim, or even kill, him, and it is his duty to do so. A sentinel who allows a prisoner to escape without firing upon him, and firing to hit him, is, in my judgment, guilty of a most serious military offense, for which he should and would be severely punished by a general court-martial.                    Henry A. Morrow,
"Colonel 21st Infantry, Commanding Post."

"[Indorsement.] I was not aware that such a view had ever been questioned. That the period is a time of peace does not affect the authority and duty of the sentinel or guard to fire upon the escaping prisoner, if this escape cannot otherwise be prevented. He should, of course, attempt to stop the prisoner before firing, by ordering him to halt, and will properly warn him by the words, 'Halt, or I fire,' or words to such effect.
"W. Winthrop, Judge Advocate."

"[Indorsement.] Respectfully returned to the commanding general, department, of the Columbia, approving the opinion of the commanding officer 21st infantry, and of the judge advocate of the division, in respect to the duty of, and method to be adopted by, sentinels in preventing prisoners from escaping.
"By command of Major General Schofield.
"J. C. Kelton, Assistant Adjutant General."

It may be truthfully said that the construction placed upon the articles of war, and the rules and regulations promulgated by the executive through the secretary of war, by the commanding officer of a military department, though approved by the secretary of war, are not binding upon the judicial department, yet they are entitled to great weight, and to the noncommissioned officer and private soldier ought to be unquestioned, when ordered to act in conformity therewith, and should be their full protection for so acting.

It is said the foregoing rule only applies when a prisoner is attempting to escape, and has no application to the present hearing, for the reason that Morgan, at the time he was shot, was not attempting to escape, but had already effected an escape. Even so; yet it is material, in determining the question as to whether the order given by Serg. Simpson, the officer of the guard, to the petitioners, to shoot if the commands to halt were disobeyed, was an order which should have been disregarded by petitioners. The law is that an order given by an officer to his private, which does not expressly and clearly show on its face its own illegality, the soldier is bound to obey, and such order is his full protection. Riggs v. State, 3 Cold. 85; McCall v. McDowell, Fed. Cas. No. 8,673; U. S. v. Clark (C. C.) 31 Fed. 710. In McCall v. McDowell it is said:

"Except in a plain case of excess of authority, where, at first blush, it is apparent and palpable to the commonest understanding that the order is illegal, I cannot but think that the law should excuse the military subordinate when acting in obedience to the orders of his commander. The first duty of a soldier is obedience, and without this there can be neither discipline nor efficiency in an army. If every subordinate officer and soldier were at liberty to question the legality of the orders of the commander, and obey them or not, as they may consider them valid or invalid, the camp would be turned into a debating

school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions."

Justice Brewer in Re Grimley, 137 U. S. 147, 11 Sup. Ct. 54, 34 L. Ed. 636, said:

"While our regular army is small compared with those of European nations, yet its vigor and efficiency are equally important. An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier."

While I do not say that the order given by Serg. Simpson to petitioners was in all particulars a lawful order, I do say that the illegality of the order, if illegal it was, was not so much so as to be apparent and palpable to the commonest understanding. If, then, the petitioners acted under such order in good faith, without any criminal intent, but with an honest purpose to perform a supposed duty, they are not liable to prosecution under the criminal laws of the state. In re Lewis (D. C.) 83 Fed. 159, it is said:

"Where an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet. where there is no criminal intent on his part, he does not become liable to answer to the criminal process of a different government. With our complex system of government, state and national, we would be in an intolerable condition if the state could put in force its criminal laws to discipline United States officers for the manner in which they discharge their duties. Or, take it the other way, if the government of the United States should prosecute as criminals sheriffs and other ministerial officers, justices of the peace, and judges of superior courts for errors of judgment, or ignorance, causing blunders in the discharge of their duties, it would bring on a condition of chaos in a short time."

The evidence in this case shows that petitioners acted entirely without malice; that the conditions existing at the place and time of the shooting were such as to cause an honest belief on their part that Morgan would, in all probability, effect his escape unless disabled; that they did not shoot with a purpose of killing, but only to disable. I am mindful of the rule of law that in a habeas corpus proceeding the court will not examine the evidence for the purpose of determining whether the party should be pronounced guilty or innocent of the offense for which he is imprisoned; yet in a case of this character it is not only proper, but necessary, for the court to determine whether the parties acted wantonly and with criminal intent, or whether their acts, though wrongful, were errors of judgment only. If they acted wantonly, with a criminal intent, then they were not acting within the scope of the authority conferred by the laws of the United States. On the other hand, if they acted without any criminal intent, but in an honest belief that they were only discharging the duties of a soldier, then their offense, if offense it was, was not against the laws of the state, and in such case the state has no jurisdiction. Petitioners were charged with the duty of arresting Morgan, a deserter from the army of the United States, who had escaped, or was attempting to escape, from confinement

therefor, and, if what they did was in the honest belief that they were discharging their duty, they are not answerable to the criminal laws of the state. As was said by Judge Shiras in Re Waite (D. C.) 81 Fed. 359:

"The sole question properly arising before this court is that of the jurisdiction of the district court of Howard county, and, under the facts established by the evidence adduced, the first matter for consideration is whether an officer or agent of the United States, engaged in the performance of a duty arising under the laws and authority of the United States, is liable to a criminal prosecution in the courts of the state for acts done by him in his official capacity. This presents a matter of moment much beyond the mere question of the detention of the liberty of the petitioner as an individual. Broadly stated, it involves the proposition whether the operations of the government of the United States in matters within its sole control, and which operations, of necessity, must be carried forward by means of officers and agents duly appointed, can be interfered with by criminal proceedings instituted in the state courts, and based upon acts done by such officers or agents within the scope of the duties imposed upon them. By this it is not meant to assert that because a person is an officer or agent of the federal government he is thereby excepted out from the jurisdiction of the state or the binding force of its laws. The mere fact that the acts by him done were done he was an officer of the United States, charged with certain duties to that government, will not afford him immunity from prosecution under the laws of the state; nor will the mere fact that he claims that the acts done were within the line of his official duty afford him protection, if the acts are such as to show that the claimed immunity is a mere subterfuge, and that under no fair consideration of his official duty could he have assumed that he was acting in his official capacity when the acts complained of were done by him. But when an officer of the United States is charged with the performance of certain duties under the laws of the United States, and in the general performance thereof he does acts which it is claimed are in excess of his proper duty, or which are violative of the rights of other citizens, the question is whether a prosecution therefor can be sustained in the state courts, when it is apparent that the institution and maintenance thereof may interfere with the enforcement of the laws of the United States or with the operations of that government. Under this aspect of the question, the point is not what the rights of individual citizens might require for their proper protection, but whether the government of the United States, acting in the interest of the entire community, has not the right to assert that its operation within the jurisdiction conferred by the constitution, and wherein it is supreme and paramount, cannot be interfered with under the laws of the state; and that to prevent such interference it must be held that an officer or agent of the United States, when engaged in the performance of his official duties, is not amenable to the laws or courts of the state in a criminal prosecution based upon acts by him done in connection with his official duties. If in the performance of these duties the officer so acts as to violate his duty to the United States, that government, and not the state, is the proper party to call him to account. If the acts done are violative of the rights of individuals, a civil action for damages may be maintained, or protection may be sought under the laws of the United States, and thus a remedy may be afforded to the citizen without bringing the federal and state governments into conflict, or without unduly interfering with the operations of that government under whose authority the officer is acting."

This case was affirmed, and the doctrine announced approved by the court of appeals, in 31 C. C. A. 403, 88 Fed. 102.

There is another view of the subject requiring consideration,— that is that, the act done by petitioners being an attempt at enforcement of the military law of the United States, a subject over which the state has no control or concern, state statutes can have no application thereto. As said in Re Waite:

"It will not be questioned that to sustain a criminal prosecution the statute upon which it is based must be binding upon the person, and applicable to the acts which form the basis of the prosecution. If, when the acts were done, the same were not within the plane of the jurisdiction of the state, then the statute of the state has no application thereto, and it cannot be predicated of the acts that they constitute violations of the statutes of the state."

This doctrine and case was cited with approval in Ohio v. Thomas, 173 U. S. 276, 19 Sup. Ct. 453, 43 L. Ed. 699.

It has been uniformly held that the courts of a state have no jurisdiction of the crime of perjury committed in an examination before a commissioner under the United States bankrupt act; in testifying before a commissioner of the circuit court of the United States; in making an affidavit under the acts of congress relating to the sale of public lands; in testifying before a notary public of the state upon a contested election of a member of the house of representatives of the United States. State v. Pike, 15 N. H. 83; Ex parte Bridges, 2 Woods, 428, Fed. Cas. No. 1,862; State v. Shelley, 11 Lea, 594; Ross v. State, 55 Ga. 192; State v. Adams, 4 Blackf. 146; People v. Kelly, 38 Cal. 145; State v. Kirkpatrick, 32 Ark. 117; In re Loney, 134 U. S. 372, 10 Sup. Ct. 584, 33 L. Ed. 949.

In State v. Pike, supra, Chief Justice Parker said:

"The matters from which the charge now before us arises are alleged to have occurred under, and in the course of the execution of, the laws of the United States. Those laws required certain things to be done. Congress had the right to prescribe how they should be done, to regulate the duties of all persons who acted under the law, and to prescribe penalties for the violation of such duties. In such case, if acts are done which, if transacted under the laws of this state, would have constituted offenses within the provisions of our Criminal Code, yet, being done in pursuance of the laws of another government (having the sole power to regulate the whole proceeding) authorizing the act to be done, prescribing the mode, imposing the duty, and affixing the penalty for the violation of it, the acts cannot be regarded as having been done under the sanction of the laws of this state, so as to subject the parties to punishment under those laws."

These decisions are directly applicable to the case at bar. In the matter before us the petitioners were acting for and on behalf of the United States, under the military authority of the United States,—a subject-matter the control of which, under the constitution, is vested solely in the general government. The state cannot in any particular, either through its legislative or judicial department, regulate or circumscribe the powers of the United States in respect thereto. The wisdom, expediency, or justness of the military laws, rules, and regulations adopted and prescribed by the United States are no concern of the state. The proper enforcement of such laws, rules, and regulations cannot be measured and determined by state laws. To require the petitioners to answer for their acts to the state courts is to permit the state courts to administer the military laws of the United States; to determine in a criminal proceeding the extent of authority possessed by the soldier under those laws; to say when, and under what circumstances, the subordinate may disregard and disobey the orders and commands of his superior officer; to determine the amount of force which the United States may use to apprehend one charged with a military offense; in short, to nullify the rules and regulations

adopted to insure the efficiency of the military service. As said by Mr. Justice Brown, when on the district bench, in U. S. v. Clark, supra:

"It would be extremely unwise for the civil courts to lay down general principles of law which would tend to impair the efficiency of the military arm, or which would seem to justify or condone conduct prejudicial to good order and military discipline. An army is a necessity—perhaps I ought to say an unfortunate necessity—under every system of government, and no civilized state in modern times has been able to dispense with one. To insure efficiency, an army must be, to a certain extent, a despotism. Each officer, from the general to the corporal, is invested with an arbitrary power over those beneath him, and the soldier who enlists in the army waives, in some particulars, his rights as a civilian, surrenders his personal liberty during the term of his enlistment, and consents to come and go at the will of his superior officers. He agrees to become amenable to the military courts, to be disciplined for offenses unknown to the civil law, to relinquish his right of trial by jury, and to receive punishments which, to the civilian, seem out of all proportion to the magnitude of the offense."

Finding, as I do, that the act of petitioners in the shooting of Morgan, under the circumstances as shown by the evidence, was an act done in the performance of their duty as soldiers of the United States, it follows that the state courts are without jurisdiction in a criminal proceeding to determine whether they exercised proper care, judgment, and discretion in the discharge of that duty. For this reason the imprisonment of petitioners is in violation of their rights under the constitution of the United States, and they are entitled to their discharge.