829 F.2d 1121
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
STATE OF MARYLAND, Plaintiff-Appellant,
v.
Gerald F. DeSHIELDS, Jr., Defendant-Appellee.
 No. 86-5180.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1987.
Decided Sept. 25, 1987.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge. (CR-86-242).
 Ronald Mark Levitan, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), for appellant.
 Larry Alan Ceppos (Donnahue, Ehrmantraut & Montedonico, Chartered, on brief), for appellee.
 Before SPROUSE and CHAPMAN, Circuit Judges, and MOTZ, United States District Judge, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal presents the question of whether the Supremacy Clause[1] of Article VI of the United States Constitution may be used to divest a state court of jurisdiction to try on a charge of automobile man slaughter and related traffic offenses, a member of the United States Army Reserve, who, while on active duty, and while acting in accordance with the orders of a superior army officer is involved in a fatal automobile collision. The district court held that the Supremacy Clause conferred immunity from state court prosecution to the defendant. We agree, and we affirm.
 
 
 2
 * On August 2, 1985, Gerald F. DeShields, Jr. was on active duty as a Specialist 4th class attached to the 331st Military Intelligence Company, at Ft. Meade, Maryland. On this day a Company picnic was held off-base in Anne Arundel County. All members of the 331st Military Intelligence Company, who were not assigned to other duties, attended, and those attending were considered to be on duty. Food and beverages, including beer, were provided by the unit, and some reservists brought other alcoholic beverages.
 
 
 3
 During a softball game Sgt. Wilson Lymon injured his ankle while sliding into home base. Sgt. Alfonso Powell was the noncommissioned officer-in-charge, and he decided that Sgt. Lymon should be taken to Kimbrough Army Hospital at Ft. Meade, since the injury occurred while Sgt. Lymon was on active duty. Sgt. Powell informed Maj. Gawling and Capt. Kirk of his decision to have Sgt. Lymon. transported to the hospital in the only military vehicle on the scene which was known to the military as CUCV, but more easily identified as a Chevrolet Blazer. The first person Sgt. Powell approached to drive Sgt. Lymon to the hospital did not have a military driver's license. Sgt. Powell then approached the defendant DeShields, who was eating at one of the tables. The defendant had a military driver's license and Sgt. Powell told the defendant that he wanted him to drive Sgt. Lymon to the hospital, and Powell asked DeShields if he was all right. The parties agreed that this inquiry was not directed toward the state of the defendant's health, but concerned the defendant's sobriety and his ability to drive the CUCV. Sgt. Powell testified that he asked this question because he was aware that almost everyone was drinking beer, and some had consumed hard liquor, and he wanted to be sure that DeShields was able to operate the vehicle. He testified that DeShields spoke clearly, his physical appearance was fine, he did not appear to be under the influence of alcohol, and he did appear to be capable of operating the vehicle. Sgt. Powell also stated that his direction to DeShields to drive Sgt. Lymon to the hospital was an order by him, as noncommissioned officer in charge, to Specialist 4th Class DeShields while the two were in the military. Prior to the time that DeShields and Lymon entered the vehicle, Sgt. Powell again checked Maj. Gawling and Cpt. Kirk and they approved his decision to have Lymon transported to the military hospital.
 
 
 4
 Sgt. Powell also watched defendant drive the vehicle from the area and testified that he drove in a normal manner without any appearance of being under the influence of alcohol.
 
 
 5
 On the way to the hospital DeShields followed the most direct route and made no stops or detours. No alcoholic beverages were consumed during this trip. As the vehicle was proceeding on a long traffic ramp merging into Route 32, there were a number of vehicles ahead of the defendant. The lead car on the ramp suddenly stopped and there was action taken by the following vehicles to avoid rear ending one another. In an effort to avoid colliding with the rear of the vehicle in front of him, DeShields swerved to the left, lost control, crossed the median and collided with an oncoming vehicle. As a result of this collision the driver of the other vehicle was killed and defendant and Lymon sustained serious injuries.
 
 
 6
 Sgt. Lymon was at the time, and had been for a period of 15 years, a Baltimore City School Police Officer. At the hearing on the defendant's motion to dismiss, the testimony of Sgt. Lymon was proffered, without objection from the State, that in Lymon's opinion DeShields drove carefully, safely and within the speed limit from the time he left the picnic until the collision occurred.
 
 
 7
 Shortly after the accident a blood alcohol test was conducted on the defendant in a manner not approved for forensic use by the State of Maryland, and this test reflected a level of .10 percent, by weight. Later a state approved test was administered and resulted in a reading of .04.
 
 
 8
 On December 6, 1985, the State's Attorney of Anne Arundel County, Maryland filed a six count criminal information charging defendant DeShields with automobile man slaughter, driving under the influence of alcohol, reckless driving, negligent driving, failure to drive right of center, and driving at a speed greater than reasonable. On May 14, 1986 the case was removed to the United States District Court for the District of Maryland on petition of the United States Attorney pursuant to the provisions of 28 U.S.C. Sec. 1442(a).[2] Thereafter the defendant filed a motion to dismiss upon the ground that the prosecution by the State violated the Supremacy Clause. At the hearing on the motion the State did not call any witnesses and relied upon the stipulated facts and the deposition testimony of Sgt. Powell. The district court granted the motion to dismiss and this appeal followed.
 
 II
 
 9
 In the famous case of In re Neagle, 135 U.S. 1, (1890), the Supreme Court held that, by reason of the Supremacy Clause, a federal officer cannot be held on a state criminal charge when the alleged crime arose during the performance of the officer's federal duties:
 
 
 10
 [i]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and propel for him to do, he cannot be guilty of a crime under the law of the State of California.
 
 
 11
 135 U.S. at 75 (emphasis in original).
 
 
 12
 David Neagle was a Deputy United States Marshal and under orders from the United States Marshal for the Northern District of California, and in pursuance of instructions from the Attorney General of the United States, he was protecting the person of Stephen J. Field, a Justice of the Supreme Court of the United States, who in the summer of 1889, was sitting as a circuit judge. In the summer of 1888, Justice Field had delivered an opinion while sitting as a circuit judge, which opinion decided that a certain purported marriage certificate involving one Sharon and Sarah Althea Hill was a forgery and utterly null and void. Sarah Hill had subsequently married one David S. Terry, both of whom were in the courtroom when the opinion was announced, and both created quite a disturbance. They were ejected from the courtroom, but not before David Terry had a pulled a Bowie-knife from his coat and assaulted a Deputy Marshal. Neagle, then a Deputy marshal subdued David Terry, and both Terrys were imprisoned for contempt of court. During the ensuing year the Terrys made various threats upon the person of Justice Field and made statements that they intended to kill him when the opportunity presented itself.
 
 
 13
 Prior to Justice Field's return to the circuit in the summer of 1889, certain persons in California and in Washington asked the Attorney General of the United States to furnish protection to Justice Field while he was in California. As a result the Attorney General directed the United States Marhsal for the Northern District of California to exercise unusual caution in protecting Justice Field from Mr. and Mrs. Terry. Marshal Franks appointed Deputy Neagle to attend upon Justice Field, both in court and while going from one court to another, and to protect him from any assault that might be attempted upon him by Mr. and Mrs. Terry.
 
 
 14
 On August 14, 1889 Justice Field was returning to San Francisco from Los Angeles where he had been engaged in the business of the court. He was riding the train and was advised by Neagle that Mr. and Mrs. Terry got on the train at Fresno.
 
 
 15
 As was the custom at that time, the train stopped for breakfast at Lathrop. Neagle had the conductor of the train wire ahead to be sure that peace officers were at the train station when it arrived in Lathrop, because he feared violence might be attempted by Terry upon Justice Field. Neagle advised Justice Field that the Terrys were aboard the train and suggested that he eat in his car, but he refused and went into the dining room. During the meal Mr. Terry got behind the Justice and suddenly struck him twice in the face. Neagle drew his revolver, identified himself as a law enforcement officer, and demanded that Terry stop. Terry reached inside his coat for his Bowie-knife and Neagle shot him dead. Thereafter an Information was issued by the County of San Joaquin charging both Justice Field and Deputy Marshal Neagle with murder. The Governor of California upon learning of the warrant immediately contacted the Attorney General of the State and urged that Justice Field not be arrested and the charge against him dismissed. The charges against Field were dismissed, but those against Neagle remained and the issue was presented as to whether the State of California could hold Neagle responsible for the actions he took as an officer of the United States acting under orders from his superiors.
 
 
 16
 In re Neagle establishes a two-part test. First, was the federal officer or agent acting under the laws of the United States, and, if so, was his conduct necessary and proper in the performance of his duties? This test was applied by the district court, and it found that Neagle applied to the present facts so as to require dismissal of the Maryland criminal charges against DeShields. The district court found that DeShields was on active duty with the military and he was ordered by a superior to take a federal soldier to the hospital, and in the course of performing this duty, he became involved in the fatal collision. The court concluded that as a reservist on active duty he was an agent of the United States and acting under the laws of the United States, and that in carrying out the assignment of a superior officer he was in the performance of his duties.
 
 
 17
 The Supremacy Clause has been used in many factual settings to prevent a state from prosecuting an officer or agent of the United States for some act committed in the performance of federal duties.
 
 
 18
 In Johnson v. Maryland, 354 U.S. 51 (1920) the court held that the State of Maryland could not arrest, convict and fine an employee of the Post Office Department of the United States for driving a government truck on the highways of the State of Maryland without having first obtained a Maryland driver's license. The Court was careful to point out that the basis for its opinion was the Supremacy Clause and not the Commerce Clause.
 
 
 19
 Our court in State of West Virginia v. Laing, 133 F 887 (4th Cir. 1904) prevented the state from prosecuting members of a posse comitatus who fatally wounded a fugitive in an effort to arrest him. Our court observed:
 
 
 20
 The appellees were, at the time Harless was killed, representing the government of the United States in enforcing the orders of its court. It was the duty of that government to see that such orders were respected, as it is also its duty, as well as the duty of the court, to see that the appellees, who have properly discharged the obligations that had been imposed upon them by the Laws of the United States, are protected from arrest and punishment by any other authority whatsoever. It is because of this that the insistence of counsel for appellant that appellees should have been remanded for trial by the state court is without merit. (citations omitted)
 
 
 21
 If the appellees properly discharge their duties as members of the posse comitatus, as we find that they did, then they were not guilty of any crime against the State of West Virginia, for surely the performance of a duty to the United States cannot be a wrong to the state. A state court has not the right to arrest, convict, and punish an officer of the United States for an act lawfully done by him in the discharge of his official duties. If such court has that right, then the federal government is without the power necessary for its own protection. ....
 
 
 22
 We would have in our midst an anomalous condition of affairs if the courts of the state could arrest and punish the officers of the federal government for acts done by them when they were lawfully discharging their duties under the laws of the United States. The right to arrest and punish them would carry with it the power to prevent them from discharging their duties. Such right does not exist, for the government of the United States, under its Constitution, possess all the power necessary to its existence as an independent nation. As a nation it is absolutely sovereign over every foot of soil, and over every person found within the limits of its territory, and its sovereignty gives it the power to make and execute its own laws, in its own way and in its own tribunals.
 
 
 23
 133 F. at 891, 892.
 
 
 24
 A similar result, but in a military setting, was reached In re Fair, 100 F. 149 (C.C.D.Neb.1900) in which an army corporal was ordered by his sergeant to pursue an escaped prisoner and to shoot him if he failed to halt. The corporal found the escaped prisoner, who failed to obey the corporal's commands and was killed by the corporal. The state brought charges against the corporal and claimed that since the order of the sergeant was illegal, the corporal was not protected. The court held that "an order given by an officer to his private, which does not expressly and clearly show on its face its own illegality, the soldier is bound to obey, and such order is his full protection." 100 F. at 154. In state of Montana, County of Fergus v. Christopher, 345 F.Supp. 60 (D.Mont. 1972) Christopher was an Airman First Class and was operating a tilt-bed truck on the highways of Montana without proper direction signal lights. He was charged by a state policeman with a traffic violation. The case was removed to the federal court and was dismissed by application of the Neagle principle. The court held that the Air Force was engaged in an emergency snow removal project related to a flood. Christopher had reported the loss of brakes and the direction signal lights on the trailer, but he was ordered by superior officers to use the trailer on the highways to complete the snow removal work. The court stated that while it might be argued that the Air Force officer had no power to order Christopher to violate traffic laws of the State, and that Christopher should have known the order was unlawful and that he was not obligated to obey, it could also be argued that the federal necessity was of such magnitude that state traffic laws had to yield. The court concluded:
 
 
 25
 We deal here, however, with a noncommissioned officer sitting between the Scylla of a direct military order on the one hand and the Charybdis of the Highway Patrol on the other. I think it would be inimical to the discipline of the Armed Forces and unfair to the individual involved to make the immunity from state prosecution dependent upon the basic validity of the kind of order given here. I hold that a military person performing a direct order which does not require the unlawful violation of the person of another or which is not obviously contrary to fundamental notions of morality is immune from prosecution under state law.
 
 
 26
 345 F.Supp. at 61.
 
 
 27
 It is obvious that DeShields was a federal officer or agent acting under the orders of a superior officer when he left the picnic driving the army vehicle to deliver Sgt. Lymon to the Kimbrough Hospital. This satisfies the first prong of Neagle. The question remains as to whether the defendant has satisfied the second prong--that his conduct in the discharge of this order was necessary and proper.
 
 
 28
 The state argues that DeShields exercised poor judgment in carrying out the order and that he was not ordered to drive the vehicle while under the influence of alcohol. The state argues that DeShields was not told to drive while intoxicated and that he alone knew of his intoxication.
 
 
 29
 Sgt. Powell was aware that DeShields had consumed some alcoholic beverages at the picnic. He inquired as to DeShields condition. This inquiry was obviously directed toward his sobriety. Sgt. Powell also noticed the manner in which DeShields drove the military vehicle through the crowded area where other cars were parked. The Sergeant did not believe that DeShields was incapacitated or that his driving was impaired. There is no claim that the defendant consumed any additional alcohol after beginning the trip, nor is there a claim that he deviated from the most direct route to the hospital. The state argues that because he had been drinking and lost control of his vehicle, DeShields was not carrying out his orders in a necessary and proper manner.
 
 
 30
 The only evidence before the district court showed that as the defendant was proceeding down the ramp at the interchange of two busy highways, a vehicle several cars ahead of him suddenly stopped and this required the defendant and the cars between him and the stopped vehicle to take immediate action. His choices were to turn right into a ditch, to try to stop, and probably rear-end the vehicle in front of him, or to turn left. He turned left, but lost control of the car and the collision resulted.
 
 
 31
 Of course he was not ordered to turn left or lose control, but his immunity from state criminal charges is not so narrowly defined. A federal agent may lose his Neagle protection if he acts out of personal interest, malice, or with actual criminal intent. Baucom v. Martin, 677 F.2d 1346, 1350 (11th Cir. 1982).
 
 
 32
 Errors in judgment alone will not establish criminal responsibility of a federal officer. Clifton v. Cox, 549 F.2d 722, 727 (9th Cir. 1977). "The test on what is 'necessary and proper' is a subjective one and goes to whether the defendant reasonably thought his conduct was necessary and justifiable." Commonwealth of Kentucky v. Long, 637 F.Supp. 1150 (W.D. Ky. 1986).
 
 
 33
 The state relies upon Lilly v. State of West Virginia, 20 F.2d 61 (4th Cir. 1928) which is an involuntary manslaughter prosecution by the state against a federal prohibition agent, who was driving a car which struck a pedestrian in a crosswalk in Huntington, West Virginia, while the agent was chasing a fleeing bootlegger. The evidence showed that Lilly was on the left side of the street, because he was passing a truck as he approached the intersection, and that he was exceeding the posted speed limit. The court concluded:
 
 
 34
 The failure to recognize speed ordinances under such circumstances must be viewed in the light of the rights of others to be affected, and a contrary view would operate unreasonably and be highly prejudicial to the public. The officer in this case was warranted in attempting to make the arrest under the circumstances, and he is by reason thereof excepted from the limitations of the speed prescribed by the city ordinance in issue, provided the 3ury believed that he acted in good faith in what he did, and with the prudence, care, and caution that an ordinarily prudent person would have exercised under the circumstances in which he was placed; the degree of care required be commensurate with the dangers existing, and to be increased in proportion to such dangers should there be an increase thereof. The traffic ordinances of a city prescribing who shall have the right of way at crossings and fixing speed limits for vehicles are ordinarily binding upon the officials of the federal government as upon all other citizens.
 
 
 35
 29 F.2d at 64.
 
 
 36
 Maryland argues that DeShields was not ordered to drive the vehicle while under the influence of alcohol, and that under Lilly, it is a jury question as to whether DeShields was using due care under the circumstances. Lilly is different from the present case, however, because here DeShields was directly ordered to drive Sgt. Lymon to the hospital by his superior officer who was fully aware of the fact which lies at the crux of the State's prosecution-that DeShields had been drinking. In any event, at the hearing on the motion to dismiss the State presented no admissible evidence that Deshields was under the influence of alcohol or that he did not operate the vehicle with a degree of care required by the circumstances. The deposition of Sgt. Powell. was presented to the district judge, and it confirmed that Sgt. Powell did not believe that DeShields was incapicitated after Powell talked with DeShields and had the opportunity to observe the manner in which he was driving. it was undisputed that DeShields consumed no additional alcohol thereafter and did not deviate from a direct route from the picnic to the hospital. It was proffered to the court, with no objection from the State, that Sgt. Lymon, a fifteen year veteran as a Baltimore police officer, would testify that DeShields drove carefully, safely and within the speed limit from the time he left the picnic until the collision occurred. The only evidence relied upon by Maryland is the blood-alcohol tests. The result of the first test would not be admissible, and the result of the second test, which was properly conducted, showed a reading of .04. This reading does not raise a presumption of intoxication, but on the contrary, raises a presumption under Maryland law that a defendant was not intoxicated and was not driving while under the influence of alcohol. See Md. Cts. & Jud. Proc. Code Ann. Sec. 10-307(b) (1984).
 
 
 37
 The only evidence before the district court established that DeShields was on active duty with the United States Army and was carrying out a legal order from a superior while driving the vehicle that was involved in the collision, and that his conduct in driving the vehicle was necessary and proper in the performance of his duties, and that any error made by him in the operation of the vehicle was an error of judgment, which error does not deprive him of protection by the Supremacy Clause under the Neagle test. Under these circumstances the district court was correct in dismissing the state criminal proceedings, and we affirm.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Article VI ... this Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges of every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding
 
 
 [2]
 28 U.S.C. Sec. 1442(a)
 A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the District Court of the United States for the district and division embracing the place wherein it is pending:
 (1) Any officer of the United States or any agency thereof, or other person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.