UNITED STATES ex rel. FLYNN et al. v. FUELLHART, Sheriff.

(Circuit Court, W. D. Pennsylvania. February 14, 1901.)

1. HABEAS CORPUS—SECRET-SERVICE RULES.

Rules and regulations for the government of the agents of the secret-service division of the United States treasury department, promulgated by authority of the secretary of the treasury, are laws of the United States, within Rev. St. U. S. § 753, authorizing the issuance by a federal court of the writ of habeas corpus in case of a prisoner in custody for an act done in pursuance of a law of the United States.

2. SAME—ASSISTING IN ARREST WITHOUT WARRANT.

Agents of the secret-service division of the treasury department of the United States, with a marshal having a warrant for arrest of L. for making counterfeit coins, visited the house of B., in the country, and remote from magistrates, and told B. of their purpose. He immediately tried to put out of the way articles commonly used in counterfeiting, and handed to his wife an incompleted counterfeit coin, which she attempted to conceal. Held, that this was a case within the secret-service rules, sanctioning arrest without a warrant, in cases of "exceedingly rare occurrence"; so that such agents, having been taken into custody on a charge of assault and battery, in that they assisted in the arrest of B., should be discharged on habeas corpus.

Sur Writ of Habeas Corpus.

D. M. Miller, Asst. U. S. Atty., for relators.
C. George Olmstead, for respondent.

ACHESON, Circuit Judge. Upon the petition of William J. Flynn and Thomas F. Berriman, agents of the secret-service division of the treasury department of the United States, who were restrained of their liberty by, and were in the custody of, John H. Fuellhart, sheriff of Warren county, Pa., the writ of habeas corpus here was issued under the authority conferred by sections 751–753 of the Revised Statutes of the United States, and the case has been heard by the court, and is now to be disposed of agreeably to the provisions of section 761, which enacts:

"The court, or justice, or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require."

It appears from the sheriff's return to the writ of habeas corpus, and otherwise, that the petitioners were in the custody of the sheriff by virtue of process issued out of the court of quarter sessions of Warren county, Pa., based on two indictments found in that court at No. 17 and No. 18, December sessions, 1900; one charging the petitioners with assault and battery upon the person of one John B. Bennett, and the other charging them with malicious mischief with respect to his property. Each of these two criminal proceedings was instituted by the said John B. Bennett, and he is the prosecutor in each of them. At the hearing before this court the following formal admission was entered of record: .

"It is admitted that the charge of assault and battery and malicious mischief against William J. Flynn and Thomas F. Berriman, upon which indictments were found against them at No. 17 and No. 18, December sessions, 1900,

in the quarter sessions court of Warren county, Pennsylvania, grew out of the acts of the said officers in their searching the house of John B. Bennett, arresting and conveying him to the United States commissioner (said officers acting in conjunction with W. S. Blair, the United States deputy marshal)."

The facts, as clearly shown by the evidence, are these: The petitioners are, and on the 1st day of October, 1900, were, duly and lawfully appointed agents of the secret-service division of the treasury department of the United States, assigned to duty in the Western district of Pennsylvania, of which Warren county is part. On the day last named the petitioners, in the discharge of their official duties as such agents, in company with W. S. Blair, a deputy United States marshal for said district, who had a lawful warrant for the arrest of one John Henderson upon a charge of making and passing counterfeit coins of the United States, visited the dwelling house of said John B. Bennett, in Warren county, where they were informed Henderson was abiding. The three officers entered the house through the doorways without any violence. Bennett was told the purpose of their visit. The only inmates of the house were Bennett, his wife, and one Hyde. Bennett immediately and hurriedly tried to reach a shelf above an inside door, with the evident purpose of removing something from the shelf, but failed. He then hastened upstairs, and was there seen by the officers pouring a fluid from a bottle into an open space between the weather boarding and the inside plastering of the house. Investigation then made showed that this fluid was cyanide of potassium, which is commonly used by counterfeiters in silver plating. Upon his return downstairs Bennett was observed to hand something to his wife, which she attempted to conceal, but upon rising from her chair the officers noticed on the seat thereof a counterfeit dollar, not completely finished. Upon being asked at the time if he had any explanation to give as to this counterfeit dollar, Bennett said he had none, and told his wife not to say anything. A 25-cent counterfeit coin in an unfinished state was found in the pocket of Hyde, who stated to one of the officers that Bennett had put it there. Lying on the ground outside the house was found a counterfeit half dollar. On the shelf which Bennett had tried to reach the officers found about one-half pound of cyanide of potassium and a bottle of nitric acid. This latter substance, like the former, is of common use in making counterfeit coin. In the pockets of an overcoat hanging in the kitchen were found a bottle of nitric acid and a small tin of cyanide of potassium. Bennett and Hyde each denied ownership of this coat, but afterwards Hyde stated it was his. Some plaster of Paris in dry form, in a bag, was found in the house. Out of this substance counterfeiters habitually make their molds. In the pantry was found what had evidently been a plaster of Paris mold, but the impression had been removed. In the same place was found a tin of copperas in crystal form, a substance employed by counterfeiters. In the cellar was found a cup, which had recently contained a solution of copperas and nitric acid, the inside of the cup being yet wet with the solution. Lying on a shelf in a bedroom was a genuine silver dollar, wet with nitric acid. The United States deputy marshal (the said W. S. Blair) was pres-

ent during the search of Bennett's premises made by the petitioners, and he assisted them in making such search. Believing from what then and there occurred, and from what was seen as above recited, that Bennett was guilty of making and having in his possession for a fraudulent purpose counterfeit coins of the United States, the United States deputy marshal arrested Bennett, the petitioners participating in such arrest. As soon as possible, on the same day, Bennett was taken by these officers before a United States commissioner, who bound him over to answer at the next term of the United States district court for the Western district of Pennsylvania. Indictments for making and fraudulently having in his possession counterfeit coins of the United States were found against Bennett, but upon trial he was acquitted. Aside from his arrest, no assault or battery was committed upon the person of Bennett, and no malicious mischief whatever to his property was perpetrated by either of the petitioners or by the deputy marshal.

The secret-service division of the United States treasury department lawfully exists. One of its authorized purposes is the detection and bringing to trial and punishment of makers of and dealers in counterfeit money. The rules and regulations for the government of its agents in the discharge of their duties, promulgated by the authority of the secretary of the treasury, are to be regarded, I think, as laws of the United States, within the meaning of section 753 of the Revised Statutes, relating to the writ of habeas corpus. In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55. One of these rules declares:

"It is of the first importance that warrants should be obtained before arrests are made. The exceptions to this rule should be of exceedingly rare occurrence."

By plain implication this rule sanctions an arrest without warrant under exceptional circumstances requiring immediate action. Another rule reads thus:

"Agents of this service will not attempt to search any house, store, building, boat, or other place without having first procured a search warrant, unless in case of arrest, or the necessity be so urgent that the agent is convinced the delay necessary in obtaining a warrant will be disastrous to the success of the case in hand. In all cases discretion must be used for the protection of the accused and agent alike."

The petitioners, it seems to me, in what they did here, kept within the spirit and letter of these rules, and I am of opinion that they did not exceed their duty.

The case of Bennett was very exceptional, and prompt action on the part of the United States officers was imperative. All the circumstances indicated strongly, if not conclusively, that Bennett was engaged at that time and place in making counterfeit coin, and had such coin in his possession. He was seen by the officers in the very act of putting out of reach the visible evidences of his guilt. His house was in the country, remote from magistrates. The officers had come there not expecting to arrest Bennett, but Henderson. Under the then existing facts, the case, I think, was to be classed as one of "ex-

106 F.—58

ceedingly rare occurrence," and the necessity so urgent as to excuse the absence of a search warrant or warrant for arrest. It is a mistake to suppose that no search or arrest can lawfully be made without a warrant. Wakely v. Hart, 6 Binn. 316, 318. As was there said, such prohibition would "endanger the safety of society." The constitutional provision is only against "unreasonable searches and seizures." Moreover, the petitioners acted in conjunction with the United States deputy marshal, and section 788, Rev. St., provides:

"The marshals and their deputies shall have, in each state, the same powers in executing the laws of the United States, as the sheriffs and their deputies in such state may have, by law, in executing the laws thereof."

Now, the sheriff is the principal conservator of the peace in his county. He may make arrests upon view, and he may and is bound ex officio to pursue and take all felons and other misdoers. 1 Bl. Comm. 343; South v. Maryland, 18 How. 396, 402, 15 L. Ed. 433. I entertain no doubt that upon such visible evidence of crime and guilt as existed in this case it would be the right and duty of the sheriff of Warren county to make an arrest without writ or process. In fact, Bennett's arrest was made by the United States deputy marshal, the petitioners assisting him, as they might lawfully do. It is clear to me that the imprisonment to which the petitioners have been subjected under the criminal proceedings instituted and prosecuted by John B. Bennett in the name of the commonwealth of Pennsylvania is for acts done by them "in pursuance of a law of the United States," and authorized by it. The decisions, I think, justify the court in discharging the petitioners, and require such action. Ex parte Jenkins, 2 Wall. Jr. 521, Fed. Cas. No. 7,259; Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55. Let an order discharging the petitioners be drawn.