### In re MATTHEWS.

#### (District Court, E. D. Kentucky. June 24, 1902.)

1. FEDERAL COURTS—HABEAS CORPUS—DISCHARGE OF STATE PRISONER.

A federal court or judge should not discharge on writ of habeas corpus a person in the custody of state authorities, on the ground that he is held in violation of the Constitution or of a law or treaty of the United States, unless the case is one of urgency, calling for immediate action; and this is the rule even though he is in custody for an act done or omitted in pursuance of a law of the United States, although in general such cases are ones of peculiar urgency, involving the authority and operations of the general government.

2. SAME—ACT DONE IN PURSUANCE OF FEDERAL LAW.

Petitioner, acting as a police officer of a city, and claiming to be such, with a posse, attempted to arrest a deserter from the United States

¶ 1. Jurisdiction of federal courts in habeas corpus proceedings, see note to In re Huse, 25 C. C. A. 4.

army under authority of Act Oct. 1, 1890, 26 Stat. 648, c. 1259, as amended by Act June 18, 1898, 30 Stat. 484, c. 469 [U. S. Comp. St. 1901, p. 817], which provides that it shall be lawful for any civil officer having authority under the laws of any state to arrest offenders to summarily arrest a deserter from the military service of the United States, and deliver him into the custody of the military authority. The deserter, attempting to escape arrest, was fired upon and wounded by one of the posse, and petitioner was indicted and held in custody by the state authorities for such shooting. He petitioned a federal court, and obtained a writ of habeas corpus on the ground that the act for which he was held was one done in pursuance of a law of the United States. *Held,* that the question whether the law authorized the shooting in making the arrest being a doubtful one, and the evidence being inconclusive as to whether there was reasonable ground to believe it necessary to prevent the escape, and also as to whether petitioner was a police officer, either de jure or de facto, the court would not discharge him, but would leave him to present his defense under the federal law to the state court.

Hearing on Writ of Habeas Corpus and Return Thereto.

Edward P. Morrow and J. H. Tinsley, U. S. Atty., for petitioner.
J. N. Sharp, E. T. Wesley, and O. H. Waddle, opposed.

COCHRAN, District Judge. On April 8, 1902, upon the application of J. B. Matthews, based upon his affidavit, I granted to him a writ of habeas corpus, directed to J. Frank Hines, jailer of Pulaski county, Ky., in whose custody he then was, commanding him to have the body of said Matthews, together with the cause of his caption and detention, before me, at Covington, on a certain date. The writ was duly served upon said Hines, and he made due return thereto. An agreed statement of facts and briefs of counsel, including one by the United States attorney for this district, in behalf of Matthews, were filed, and the question as to whether he is entitled to be discharged from the custody of said jailer has been submitted to me for my decision. It appears from said agreed statement of facts, in connection with Matthews' affidavit and Hines' return to the writ, that on April 15, 1901, at Somerset, in said county and state, one J. S. Warren, a citizen thereof, enlisted in the army of the United States, took the oath of a soldier, and thereafter received pay as such; that on December 2, 1901, at Ft. Keogh, Mont., said Warren deserted from said army, and returned to Pulaski county, and was at his father's house therein on March 15, 1902; that said Matthews was then acting as a policeman of said city of Somerset, claiming in good faith to be such officer, and had been so acting since January 13, 1902; that, for the purpose of arresting said Warren, and delivering him into the hands of the proper military authorities, said Matthews on said date summoned a posse and repaired to the house of said Warren's father; that said Warren resisted the arrest and attempted to escape, and would have escaped, had not Matthews, or a member of the posse, fired his pistol and shot said Warren in the leg, for the purpose of and thereby preventing his escape; that thereafter, on March 24, 1902, an indictment containing three counts was found in the circuit court of Pulaski county against said Matthews, William Phelps, and Dick Curd, by the first count of which said Matthews was charged with the offense of shooting and wounding said Warren with intent

to kill, and said Phelps and Curd with the offense of aiding and abetting said Matthews; by the second count of which said Phelps was charged with the offense of so shooting and wounding said Warren, and said Matthews and Curd with that of aiding and abetting said Phelps; and by the third count of which said Curd was charged with the offense of so shooting and wounding said Warren, and said Matthews and Phelps with that of aiding and abetting said Curd; and that it was under and by virtue of this indictment that said Matthews was taken and held in custody by said jailer.

It is claimed in behalf of Matthews that what he did in connection with the arrest of said Warren, and what he is charged with having done in said indictment, was done in pursuance to a law of the United States, to wit, section 2 of the act of Congress entitled "An act to promote the administration of justice in the army," approved October 1, 1890 (26 Stat. 648, c. 1259), and section 6 of the act of Congress entitled "An act to amend an act entitled 'An act to promote the administration of justice in the army,' approved October first, eighteen hundred and ninety, and for other purposes," approved June 18, 1898 (30 Stat. 484, c. 469 [U. S. Comp. St. 1901, p. 817]), which is in these words:

"That it shall be lawful for any civil officer having authority under the laws of the United States or of any state, territory or district to arrest offenders, to summarily arrest a deserter from the military service of the United States and deliver him into the custody of the military authority of the general government."

It is further claimed on behalf of said Matthews that, the foregoing being true, it is my duty, under sections 751–755, 761, Rev. St. [U. S. Comp. St. 1901, pp. 592–594], to discharge him from the custody of said jailer. By those statutory provisions the Supreme Court and the Circuit and District Courts of the United States, and any judge or justice thereof, are empowered to grant writs of habeas corpus for the purpose of inquiring into the cause of restraint of any prisoner in jail who "is in custody under or by color of the authority of the United States; or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States or of an order, process or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States; or being a subject or citizen of a foreign state and domiciled therein, is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection or exemption claimed under the commission or order or sanction of any foreign state or under color thereof, the validity and effect whereof depend upon the law of nations"; or if "it is necessary to bring the prisoner into court to testify." They further provide that "the court or justice or judge to whom the application is made shall forthwith award a writ of habeas corpus, unless it appears from the petition itself that the party is not entitled thereto," and upon return of the writ "shall proceed in a summary way to determine the facts of the case by hearing the testimony and arguments" and "dispose of the party as law and justice may require."

Is it my duty, then, to discharge Matthews from the custody of the jailer of Pulaski county, and thus relieve him of further accountability

to the state of Kentucky for the shooting of Warren? A proper answer to this question requires that some general considerations should be had in view. In the first place, it is not necessary that I should do this in order that he may have the benefit of said statute of the United States making it lawful for a civil officer of a state having authority to arrest offenders to summarily arrest deserters from the United States army, as a justification for his action in relation to the shooting and arresting Warren. If I do not do this, it will be the duty of the circuit court of Pulaski county on the trial of the indictment, and of the Court of Appeals of Kentucky on appeal from the judgment of the former, to give said Matthews the benefit of said statute as a justification of his said action, if the facts are such that he is entitled to it. The second clause of article 6 of the federal Constitution is in these words:

"This Constitution and the laws of the United States, which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

A recent writer in the American Law Review has had this to say concerning this clause, to wit:

"This provision presupposes that the judges in every state will have some knowledge of the Constitution, the laws, and the treaties of the federal government by which they are thus to be bound; and this community of interest and obligation obviously makes the judicial officers of the several states, in a certain high sense, members of the federal judiciary."

In the case of Robb v. Connolly, 111 U. S. 637, 4 Sup. Ct. 551, 28 L. Ed. 542, Mr. Justice Harlan said:

"A state court of original jurisdiction, having the parties before it, may, consistently with existing federal legislation, determine cases at law or in equity arising under the Constitution and laws of the United States, or involving rights dependent upon such Constitutions or laws."

And again:

"Upon the state courts, equally with the courts of the Union, rests the obligation to guard, enforce, and protect every right granted or secured by the Constitution of the United States, and the laws made in pursuance thereof, whenever those rights are involved in any suit or proceeding before them."

Furthermore, I have no right to presume that these state courts will not give the prisoner, Matthews, full benefit of said statute, and decide the matter as the prisoner is entitled to have it decided. In the case of Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868, Mr. Justice Harlan said:

"The circuit court was not at liberty, under the circumstances disclosed, to presume that the decision of the state court would be otherwise than is required by the fundamental law of the land."

Still further, it is my duty to occupy an attitude of friendliness toward these state courts. In the case of Ex parte Royall, supra, Mr. Justice Harlan said:

"In Taylor v. Carryl, 20 How. 595 [15 L. Ed. 1028], it was said to be a recognized portion of the duty of this court (and, we will add, of all other courts, national and state) 'to give preference to such principles and methods

or procedure as shall seem to conciliate the distinct and independent tribunals of the states and of the Union, so that they may co-operate as harmonious members of a judicial system, coextensive with the United States, and submitting to the paramount authority of the same Constitution, laws, and federal obligations.' And in Covell v. Heyman, 111 U. S. 182 [4 Sup. Ct. 358, 28 L. Ed. 390], it was declared 'that the forbearance which courts of coordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of the other, is a principle of comity, with perhaps no higher sanction than the ability which comes from concord; but between state courts and those of the United States it is something more. It is a principle of right and of law, and therefore of necessity."

And lastly the determination of the Court of Appeals of Kentucky, if against the right of the prisoner, Matthews, to arrest and shoot Warren, is subject to review, and, if erroneous, to correction, by the Supreme Court of the United States, upon writ of error from its judgment. In the case of Whitten v. Tomlinson, 160 U. S. 238, 16 Sup. Ct. 300, 40 L. Ed. 406, Mr. Justice Gray said:

'From the earliest organization of the courts of the United States, final judgments, whether in civil or criminal cases, rendered by the highest court of a state in which a decision of the case could be had, against a right specially set up or claimed under the Constitution, laws, or treaties of the United States, may be re-examined or reversed or affirmed by this court on writ of error. * ‧ * * Such appellate jurisdiction is limited to cases in which the decision of the state court is against the right claimed under the Constitution, laws, or treaties of the United States, because, when the decision of that court is in favor of such a right, no revision by this court is necessary to protect the national government in the exercise of its rightful powers."

What effect, then, is to be given to these several considerations? It is certain that, because of them, apart from anything else, the prisoner, Matthews, should not be denied the relief which he seeks at my hands, and compelled to litigate the question as to his right to shoot Warren under the United States law, hereinbefore referred to, in the state courts, subject to correction by the Supreme Court of the United States if they err against him in the decision thereof. It is equally certain that, because of those considerations, he should be denied that relief, and compelled to so litigate said question, unless this case is one of urgency.

It is well settled that a federal court or judicial officer should not exercise the power conferred by the statutory provision in relation to writs of habeas corpus, hereinbefore referred to, unless the case is one calling for immediate action, and hence is what is termed a case, of urgency, or of "peculiar urgency," as Mr. Justice Peckham has termed it. This because of said considerations which make the exercise of such power by a federal court or judicial officer a matter, as Mr. Justice Peckham has also termed it, of "delicate jurisdiction." Because such a case is not generally one of urgency, it is held that, as a general rule, a federal court or judicial officer should not discharge upon writ of habeas corpus a person in the custody of state authorities, on the ground that he is held in violation of the Constitution or of a law or treaty of the United States. In the case of Ex parte Royall, supra, Mr. Justice Harlan said:

"We are of the opinion that while the circuit court has the power to do so, and may discharge the accused in advance of his trial if he is restrained of

his liberty in violation of the national Constitution, it is not bound in every case to exercise such a power immediately upon application being made for the writ. We cannot suppose that Congress intended to compel those courts by such means to draw to themselves, in the first instance, the control of all criminal prosecutions commenced in state courts exercising authority within the same territorial limits, where the accused claims that he is held in custody in violation of the Constitution of the United States. The injunction to hear the case summarily, and thereupon 'to dispose of the party as law and justice require,' does not deprive the court of discretion as to the time and mode in which it will exert the powers conferred upon it. That discretion should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the states, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution."

And again:

"That these salutary principles may have full operation, and in harmony with what we suppose was the intention of Congress in the enactments in question, this court holds that where a person is in custody, under process from a state court of original jurisdiction, for an alleged offense against the laws of such state, and it is claimed that he is restrained of his liberty in violation of the Constitution of the United States, the circuit court has a discretion whether it will discharge him upon habeas corpus in advance of his trial in the court in which he is indicted; that discretion, however, to be subordinated to any special circumstances requiring immediate action. When the state court shall have finally acted upon the case, the circuit court has still a discretion whether, under all the circumstances then existing, the accused, if convicted, shall be put to his writ of error from the highest court of the state, or whether it will proceed by writ of habeas corpus summarily to determine whether the petitioner is restrained of his liberty in violation of the Constitution of the United States."

In the case of State of New York v. Eno, 155 U. S. 93, 15 Sup. Ct. 31, 39 L. Ed. 80, Mr. Justice Harlan used, concerning what had been decided in the Royall Case, these words:

"This court held that Congress intended to invest the courts of the Union, and the justices and judges thereof, with power, upon writ of habeas corpus, to restore to liberty any person within their respective jurisdictions who is held in custody, by whatever authority, in violation of the Constitution or of any law or treaty of the United States; that the statute contemplated that cases might arise when the power thus conferred should be exercised during the progress of proceedings instituted against the petitioner in a state court, or by or under the authority of a state, on account of the very matter presented for determination by the writ of habeas corpus. But it was adjudged that the statute did not imperatively require the Circuit Court by writ of habeas corpus to wrest the petitioner from the custody of the state officer in advance of his trial in the state court; that while the Circuit Court of the United States has the power to do so, and could discharge the accused in advance of his trial, if he is restrained of his liberty in violation of the national Constitution, it is not bound in every case to exercise such power immediately upon application being made for the writ."

In the case of Whitten v. Tomlinson, supra, Mr. Justice Gray said:

"But in the exercise of this power the courts of the United States are not bound to discharge by writ of habeas corpus every such prisoner."

Again:

"But, except in such peculiar and urgent cases, the courts of the United States will not discharge the prisoner by habeas corpus in advance of a final determination of his case in the courts of the state, and, even after such final determination in those courts, will generally leave the petitioner to the usual and orderly course of proceeding by writ of error from this court."

And again:

"To adopt a different rule would unduly interfere with the exercise of the criminal jurisdiction of the several states, and with the performance by this court of its appropriate duties."

And in the case of Baker v. Grice, 169 U. S. 290, 18 Sup. Ct. 326, 42 L. Ed. 748, Mr. Justice Peckham said:

"From these cases it clearly appears, as the settled and proper procedure, that while circuit courts of the United States have jurisdiction, under the circumstances set forth in the foregoing statement, to issue the writ of habeas corpus, yet those courts ought not to exercise that jurisdiction by the discharge of a prisoner, unless in cases of peculiar urgency, and that, instead of discharging, they will leave the prisoner to be dealt with by the courts of the state; that, after a final determination of the case by the state court, the federal court will even then generally leave the petitioner to his remedy by writ of error from this court. The reason for this course is apparent. It is an exceedingly delicate jurisdiction given to the federal courts, by which a person, under an indictment in a state court, and subject to its laws, may, by the decision of a single judge of the federal court, upon a writ of habeas corpus, be taken out of the custody of the officers of the state, and finally discharged therefrom, and thus a trial by the state courts of an indictment found under the laws of a state be finally prevented. Cases have occurred of so exceptional a nature that this course has been pursued, * * * but the reasons for the interference of the federal court in each of those cases were extraordinary, and presented what this court regarded as such exceptional facts as to justify the interference of the federal tribunal. Unless this case be of such an exceptional nature, we ought not to encourage the interference of the federal court below with the regular course of justice in the state court."

In the case of Eaton v. State of W. Va., 34 C. C. A. 68, 91 Fed. 760, the Circuit Court of Appeals, Fourth Circuit, affirmed a judgment of the Circuit Court of the United States for the District of West Virginia, refusing to discharge a prisoner in the custody of the authorities of West Virginia, alleged to be so detained in violation of the federal Constitution, upon the ground that there seemed "to exist no special circumstances calling for the issuance of the writ."

And in the case of Ex parte McMinn (C. C.) 110 Fed. 954, Judge Shelby denied the writ of habeas corpus to a person alleged to be in the custody of the state authorities of Alabama in violation of the federal Constitution. He said:

"There is a discretion in the federal courts in the issuance of the writ of habeas corpus, both before and after trial and judgment in the state court, in cases in which the act of the Legislature under which the state court is proceeding is challenged as in conflict with the federal Constitution. The federal courts may, in their discretion, refuse to grant the writ, and leave the petitioner to his remedy in the state courts. In this case the petitioner has clearly a remedy to review the action of the probate court in other and higher state courts. Under the circumstances of the case, I have concluded to refuse to grant the writ, leaving it to the petitioner to pursue his remedy in the state court as he may be advised."

In the case of Ex parte Kieffer (C. C.) 40 Fed. 399, Mr. Justice Brewer discharged a state prisoner on the ground that he was held in violation of the federal Constitution. This, however, was after trial and conviction in the initial state court, and because the public were interested in an immediate decision of the question. He said:

"At the outset we are met by this question: Is this a case in which the writ of habeas corpus should be allowed, even though these ordinances be-

deemed invalid? The causes of Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734 [29 L. Ed. 868], and Ex parte Fonda, 117 U. S. 516, 6 Sup. Ct. 848 [29 L. Ed. 994], affirm that there is a discretion in the federal courts in the matter of habeas corpus, both before and after trial and judgment in the state court, and in cases in which the act under which the prosecution is had is challenged as in conflict with the federal Constitution. The court, in one—perhaps both—of these opinions, declares that it is not to be assumed that the state courts will not administer the law correctly, and accord to the party all the rights guarantied to him by the federal Constitution. Therefore it is often the proper way to decline to allow the writ, leaving the party to enforce his rights in the state courts. So it is argued that, if it be true that these ordinances are in conflict with the federal Constitution, the petitioner has his remedy. He can appeal his case from the police to the district court, from there to the Supreme Court of the state, and thence to the Supreme Court of the United States. While that is true, yet he has no adequate relief in that way. He is now under sentence, and he cannot appeal without bond. He will be subjected to trial in the district court, possibly to an inquiry in the Supreme Court of the state, and finally in the Supreme Court of the United States. He must bear the expense and suffer the delay. This is not a case prior to trial and judgment. It is a case after trial and after judgment. He has experimented with the state court, and it has decided against him. While he has,.of course, the right to appeal, yet this is a burden, and personally, to him, it is an inadequate protection to say: 'You can appeal, and go through that channel to the Supreme Court of the United States.' But that is not the only consideration. If these ordinances are invalid, they are invalid because of an attempt to interfere with commerce and prevent the free exchange of commodities. between the citizens of another state and those of this city. Few persons can stand the expense of litigation running through that channel to the Supreme Court. Length of time would pass before the judgment of that court could be obtained. In the meantime, if these ordinances are enforced—not only against this petitioner, but against whoever may see fit to engage in this business—there is an interference with the exchange of commodities between the citizens of other states and those of this city, and the result will be to stop such traffic. Now, when that would be the natural result—when that is declared to be the intended purpose of this legislation—this court may, in the exercise of its discretion, properly hold, after a case has passed to judgment in the state court, that the party has a right to a speedy inquiry and determination in the federal court as to whether such ordinances are in conflict with the Constitution of the United States. The public, as well as the individual, are interested in a speedy settlement of this matter."

Judge Shelby, in the McMinn Case, supra, in referring to this case, said:

"The case was of a character that the public, as well as the individual, were interested in a speedy settlement, and it appeared that it could be more speedily settled in the federal court."

Such, then, is the well-settled doctrine of the federal courts in regard to discharging state prisoners alleged to be held in violation of the federal Constitution or laws. It is equally well settled that as a general rule, at least, the federal court or judicial officer appealed to should discharge a state prisoner held in custody for an act done or omitted to be done in pursuance to a law of the United States. This because, generally, such cases are cases of urgency—cases demanding immediate action.

In the case of Ex parte Royall, supra, Mr. Justice Harlan said:

"When the prisoner is in custody by state authority for an act done or omitted to be done in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof, or where, being a subject or citizen of a foreign state, and domiciled therein, he is in custody, under

like authority, for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission or order or sanction of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations, in such and like cases of urgency, involving the authority and operations of the general government, or the obligations of this country to, or its relations with, foreign nations, the courts of the United States have frequently interposed by writs of habeas corpus and discharged prisoners who were held in custody under state authority. So, also, when they are in the custody of a state officer, it may be necessary by use of the writ to bring them into court of the United States to testify as witnesses."

In the case of Thomas v. Loney, 134 U. S. 372, 10 Sup. Ct. 584, 33 L. Ed. 949, one who was in custody on a warrant from a justice of the peace of the state of Virginia for perjury in giving his deposition before a notary public as a witness in a case of a contested election of a member of Congress was discharged on writ of habeas corpus by the Circuit Court of the United States for the Eastern District of Virginia, and that judgment was affirmed by the Supreme Court of the United States. Mr. Justice Gray said:

"The courts of Virginia having no jurisdiction of the matter of the charge on which the prisoner was arrested, and he being in custody, in violation of the Constitution and laws of the United States, for an act done in pursuance of those laws, by testifying in the case of a contested election of a member of Congress, law and justice required that he should be discharged from such custody, and he was rightly so discharged by the Circuit Court on writ of habeas corpus."

In the case of Cunningham v. Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, the judgment of the Circuit Court of the United States for the Northern District of California, discharging, upon habeas corpus, David Neagle, a deputy United States marshal, who had killed David S. Terry in defense of Mr. Justice Field, from the custody of the sheriff of San Joaquin county, state of California, who held him a prisoner on the charge of murder of said Terry, was affirmed. This decision was upon the ground that the act of Neagle in killing Terry was an act done in pursuance of a law of the United States. The novelty of the decision lay in the fact that it was held that the act of Neagle was done in pursuance of a law of the United States. Mr. Justice Miller thus stated his conclusion in this particular:

"In the view we take of the Constitution of the United States, any obligation fairly and properly inferable from that instrument, or any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is a 'law,' within the meaning of this phrase."

In the course of the opinion, Mr. Justice Miller quotes from section 761, Rev. St. [U. S. Comp. St. 1901, p. 594], the provision that when, by writ of habeas corpus, the petitioner is brought up for a hearing, the "court or justice or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require," and adds:

"This, of course, means that if he is held in custody in violation of the Constitution or a law of the United States, or for an act done or omitted in pursuance of a law of the United States, he must be discharged."

This expression, in view of the authorities heretofore referred to, should be limited to cases of urgency. And the limitation applies as much to a case where the custody is for an act done or omitted in pursuance of a law of the United States as to a case where it is in violation of the Constitution or a law of the United States. The difference between the two cases is that in the latter, as a rule, at the least, the case is one of urgency, and in the other it is not. No other difference exists between them.

In the case of New York v. Eno, supra, Mr. Justice Harlan said:

"It will be observed that this court, in Ex parte Royall, recognized certain cases as constituting exceptions to the general rule, among which are cases of urgency, involving the authority and operations of the general government."

And in referring to the case of Thomas v. Loney, supra, he said:

"That case was one of urgency, involving, in a substantial sense, the authority and operations of the general government. The obvious effect of Loney's arrest, under the circumstances disclosed, was to embarrass one of the parties in the contested election case in obtaining evidence in his behalf, intimidate witnesses whom he might desire to introduce, and delay the preparation of the case for final determination by the House of Representatives."

In the case of Whitten v. Tomlinson, supra, Mr. Justice Gray said:

"In Ex parte Royall and in New York v. Eno it was recognized that in cases of urgency, such as those of prisoners in custody, by authority of a state, for an act done or omitted to be done in pursuance of a law of the United States, or of an order or process of a court of the United States, or otherwise involving the authority and operations of the general government, or its relations to foreign nations, the courts of the United States should interpose by writ of habeas corpus."

In the case of Ohio v. Thomas, 173 U. S. 284, 19 Sup. Ct. 456, 43 L. Ed. 699, it was held that Thomas, the governor of the soldiers' home in Montgomery county, Ohio, was properly discharged by the inferior federal court from the custody of a constable under a mittimus from the justice of the peace before whom he was tried, and by whom he was convicted, and sentenced to pay a fine of $50, and to be imprisoned until such fine was paid, for a violation of the Ohio act of 1895 in relation to the use of oleomargarine. Mr. Justice Peckham said:

"Some of the same authorities also show that this is one of the cases where it is proper to issue a writ of habeas corpus from the federal court, instead of awaiting the slow processes of a writ of error from this court to the highest court of the state where a decision could be had. One of the grounds for making such a case as this an exception to the general rule * * * consists in the fact that the federal officer proceeded against in the courts of the state may, upon a conviction, be imprisoned, as a means of enforcing the sentence of a fine, and thus the operations of the federal government might in the meantime be obstructed."

In the case of United States v. Fullhart (C. C.) 47 Fed. 802, a United States deputy marshal was released upon habeas corpus from imprisonment by virtue of state authority for using force and threats in preventing the recapture of a prisoner.

In the case of Ex parte Conway (C. C.) 48 Fed. 77, the foreman of a gang engaged in constructing and erecting the lines of the Postal Cable & Telegraph Company over and along the old state road be-

tween Charleston and Savannah, in the state of South Carolina, in pursuance to the act of Congress approved July 24, 1866, c. 230, 14 Stat. 221, which authorized the construction of telegraph lines over and along any of the military and post roads of the United States, of which said old state road was one by virtue of the act of March 1, 1884, c. 9, 23 Stat. 3 [U. S. Comp. St. 1901, p. 2708], declaring all public highways and roads to be postroads of the United States whilst kept up, was released from imprisonment, upon habeas corpus, under a warrant issued by a justice of the peace of said state for obstructing said highway. Judge Simonton said:

"I recognize to the fullest extent the delicacy of the question, and would not willingly enter into a discussion which would seem to interfere with the process of the state court. It is a principle of right and of law and of necessity that such interference should be avoided between the courts of the United States and the state courts. Covell v. Heyman, 111 U. S. 176 [4 Sup. Ct. 355, 28 L. Ed. 390]. But the duty is cast on this court of examining into the facts of cases like this—of hearing and deciding them. This has been done. The testimony of disinterested witnesses has been taken, and compared with the affidavit of the state's witnesses, and the conclusion has been reached that the cause and ground of the prosecution arise from the construction and execution of this telegraph line, and from objections to it."

In the case of Kelly v. State of Georgia (D. C.) 68 Fed. 652, a deputy United States marshal was released upon habeas corpus from custody of authorities of state of Georgia under charge of murder for killing a man who attacked him whilst he was attempting to arrest him under a warrant on a federal indictment for conspiracy and murder.

In the case of In re Weeks (D. C.) 82 Fed. 729, a deputy collector of internal revenue was released upon habeas corpus from commitment by a state court for contempt in refusing to produce evidence in that court in relation to payment of United States liquor taxes, which refusal was in pursuance of a rule and regulation of the Internal Revenue Department of the federal government. The ground upon which the discharge was based was that the "commitment interfered with the lawful operations of the federal government in laying and collecting its taxes."

In the case of Campbell v. Waite, 31 C. C. A. 403, 88 Fed. 102, it was held that a special examiner of the Pension Department, who was in custody of a state authority for threatening to accuse a pension claimant of the crime of perjury, committed by making certain statements in regard to a matter pertinent to his claim, if such statements were false, in the event that he did not tell the truth concerning such statement, which act on part of said examiner was claimed to be in violation of a state statute, and which was done in pursuance to regulations lawfully made and instructions given by the Commissioner of Pensions, was properly discharged on habeas corpus from that custody. The application for the writ and the discharge was made after the examiner had been convicted in the state court, and the judgment of conviction had been affirmed by the Supreme Court. Judge Thayer said:

"It is further suggested in the brief of the Attorney General, and some stress was laid on that point in argument, that, in any event, the petitioner should not have been discharged on habeas corpus, but should have been

remanded to the custody of the sheriff, and required to prosecute a writ of error to the Supreme Court of the United States. This contention, we think, is without merit. While it is true that the relief prayed for by the petitioner could have been obtained in the usual way by a writ of error, yet, in our judgment, the case at bar does not belong to the class of cases in which a person in custody under the warrant of a state court should be compelled to seek relief by appeal or writ of error, rather than by a writ of habeas corpus. In the case of Ex parte Royall, 117 U. S. 241, 251, 6 Sup. Ct. 734 [29 L. Ed. 868], it was said, in substance, that when a federal officer is in custody for an act done in pursuance of a law of the United States, or an order, process, or decree of a federal court, and that when a citizen of a foreign state is in custody, under the warrant of a state court, for an act done under an authority claimed to have been conferred by the sovereignty of which he is a citizen, so that our relations with foreign governments are involved in the controversy, such cases present questions of such importance and urgency that the court which is appealed to for relief may and should discharge the petitioner in a proceeding by habeas corpus, instead of compelling him to resort to the slower remedy by appeal, provided that it finds upon an investigation of the case that the petitioner's complaint is well founded. The arrest of federal officers or other persons for acts lawfully done in discharge of their duties under federal laws impairs, to a certain extent, the authority and efficiency of the general government; and for that reason no court, so far as we are aware, has ever hesitated in that class of cases to discharge a petitioner from custody by writ of habeas corpus when it appeared on a hearing of the case that the petitioner was entitled to be released from imprisonment."

In the case of In re Fair (C. C.) 100 Fed. 149, two soldiers in the United States army were discharged by writ of habeas corpus from state custody on charge of murder for killing another soldier who had deserted, and whom they were attempting to arrest in order to prevent his escaping.

In the case of United States v. Fuellhart (C. C.) 106 Fed. 911, two agents of the secret service division of the Treasury Department of the United States were discharged from state custody for assault and battery and malicious mischief upon writ of habeas corpus, because the charges against them were for acts done in searching the house of an alleged counterfeiter, and arresting and conveying him before a United States commissioner.

It is thus seen that in all the cases since the Royall Case, which is the leading case as to when it is proper for a federal court or judicial officer to discharge a state prisoner on writ of habeas corpus, the statement by Mr. Justice Harlan therein that it is proper for such discharge to be made when the prisoner is in custody for an act done in pursuance of federal law, because such a case is one of urgency, has been approved, and in cases where that was the federal question involved it has been unhesitatingly followed. But in all of those cases, save one, the prisoner was an officer or other agent of the federal government. In one he was a governor of a soldiers' home, in three he was a deputy United States marshal, in one he was a deputy collector of internal revenue, in one he was a special examiner of the Pension Department, in one he was a soldier of the United States army, and in one he was an agent of the secret service division of the Treasury Department. The imprisonment of these agencies of the national government by the state authorities was for acts done in pursuance to federal law. The restraint of their liberties interfered with the operation of the national government. There can therefore be no room for question but that

their discharge was proper. The federal courts will not permit a federal officer or agent to be restrained of his liberty by state authority for an act done in pursuance to federal law. The exceptional case referred to is that of Ex parte Conway, where the person imprisoned was not a federal officer or agent, but the foreman of a gang engaged in constructing a telegraph line along a public highway pursuant to federal authority. That was a case of urgency, because the construction of that line was a matter in which the national government and the public at large were highly interested, and the imprisonment of the persons engaged in constructing it put a stop to its construction until the matter could be disposed of in the course of the proceedings by virtue of which the imprisonment was had. On the other hand, we have found no case where a federal court or judicial officer has refused to discharge a person held in custody by state authority for an act done pursuant to federal law. And in the case of Campbell v. Waite, supra, as already quoted, Judge Thayer said:

"The arrest of federal officers or other persons for acts lawfully done in discharge of their duties under federal laws impairs, to a certain extent, the authority and efficiency of the general government; and for that reason no court, so far as we are aware, has ever hesitated in that class of cases to discharge a petitioner from custody by writ of habeas corpus when it appeared on a hearing of the case that the petitioner was entitled to be released from imprisonment."

Should this case, then, be made an exception to this class of cases? The prisoner, Matthews, is not a federal officer or agent. If officer at all, he is an officer of the state that has him in custody. Though the national government is interested in having deserters from its army arrested, and the authority in relation thereto conferred by its law exercised, the imprisonment of Matthews will interfere only with his arresting other deserters whilst he is in custody. It will not interfere with others having authority so to do exercising that authority, and the only question left in uncertainty pending the final disposition of the proceeding by virtue of which he is held is as to the right of a civil officer to shoot in order to effectuate the arrest of a deserter. There is no uncertainty as to his right to arrest without the use of such means, and that summarily; i. e., without a warrant. Counsel for the state intimates that a warrant is necessary to enable a civil officer to arrest a deserter under the law in question. I think not. The words, "Having authority under the laws of the United States or of any state, territory or district to arrest offenders," were intended simply to designate what civil officers had power conferred upon them to arrest deserters. They were officers who had authority to arrest. Such officers were thereby empowered not only to arrest, but to "summarily arrest," deserters. The authority to shoot in order to effectuate an arrest of a deserter, if it exists under this law, can be vindicated in the course of the proceedings under which the prisoner is held. It does not appear that the prisoner cannot give bond pending those proceedings. So far as his present custody is concerned, I have received the impression that it is colorable, in order to give me jurisdiction. The only hardship upon the prisoner in requiring him to vindicate his right to shoot under said law in the course of the proceedings by which

he is held is the expense thereof. There is no showing as to his ability to meet this, and as his attempt to make the arrest was voluntary, and not compulsory, and, no doubt, was to secure the reward in such cases provided, there is not as much hardship in this particular as there might otherwise be. It would seem, therefore, that if there is an exception to this class of cases, as to the duty of the federal court, or judicial officer appealed to, to interpose by habeas corpus, there is some reason, at least, for contending that this case is one. And why is it that there may not be an exception thereto? Surely if, in order to justify a federal or judicial officer interposing in a case where one is in custody of state authority in violation of the federal Constitution or laws, it is necessary that it be a case of peculiar urgency in order to justify such interposition, when one is in custody in pursuance to federal authority it must also be a case of peculiar urgency. If there is any distinction between the two classes of cases, it must be in the fact that, as a rule, in the one class there is no peculiar urgency, and, as a rule, or always, in the other class there is peculiar urgency. It is sometimes said that a state court is without jurisdiction to try and punish one for acts done in pursuance to federal law, and that, if it does so, its action is void. By this must be meant not that the state court is without jurisdiction to hear the case involving the question, but that it is bound to give the defendant the benefit of said law, and release him if he acted in pursuance thereto. If it does not do so, and undertakes to inflict punishment upon him, its action is void. But however this may be, a state court is equally without jurisdiction to try and punish one in violation of the federal Constitution and laws, and, if it does so, its action is equally void. So there can be no distinction between the two classes of cases in this direction. If, then, in every case, a federal court or judicial officer, when appealed to, must interpose and discharge one in custody for acts done in pursuance to federal authority, it must be that every such case is one of peculiar urgency. Possibly this may be so, and therefore the imprisonment by the state, whose officer he is, of a single policeman, which prevents his arresting deserters from the United States army pending the proceedings under which he is held, and to this extent interferes with the arrest of such deserters, is a case of peculiar urgency. What makes me think that this may be so is that I have found no case coming within that class where the federal court or judicial officer appealed to has refused to interpose. On the other hand, I am led to doubt— and I may say seriously—whether this is so, by the fact that the Supreme Court of the United States has laid down in such emphatic terms that the federal courts, in applying the habeas corpus statutory provisions, shall be guided by "the salutary principles" set forth at the beginning of this opinion, that they should not interpose in such a way, except in cases of peculiar urgency, and that, as a rule, the other class of cases are not of peculiar urgency, and by the further fact that in this case there is seemingly so little ground for claiming that it is a case of peculiar urgency. This doubt is so great that, in view of further considerations, yet to be alluded to, I feel that I must decline to interpose in this case. In the first place, to say the least, it is extremely doubtful whether the action of the prisoner in shooting

Matthews was in pursuance to that statute. That statute does not, in express terms, authorize a state civil officer to shoot a deserter in order to prevent his escape from arrest. It, in terms, authorizes him to arrest the deserter, and that summarily (i. e., without warrant), but no more. And there is no general rule to the effect that one who has authority to arrest another has authority to shoot him in order to prevent his escape from arrest. McClain on Criminal Law, vol. 1, § 298, thus lays down the law as to the right of a person authorized to arrest another to do an act calculated to take his life in order to prevent his escape from arrest:

"But an officer or private person acting under circumstances authorizing an arrest may use all the force necessary in overcoming resistance and defending himself against violence from the person sought to be arrested, and if, in doing so, he takes life, it is justifiable, being in pursuance of public justice. In attempting to make an arrest, however, where the person to be arrested, instead of resisting, seeks to make his escape, there is a difference, depending on the gravity of the offense for which the arrest is being made, as to whether the officer may do an act calculated to take life. If the offense for which the arrest is being made is a felony, the person (whether an officer or not, provided he is lawfully arresting) may take life if necessary in order to effect the arrest. But if the offense for which the arrest is being made is a misdemeanor, there is no right to take life, and the person seeking to make the arrest will be guilty of a crime in doing so. As to resisting the escape of a prisoner under arrest or in confinement, it seems that the officer may resist so far as necessary, and, if the attempt is so violent as to make it necessary to take life in preventing such escape, the officer will be justified in doing so, whether the prisoner is under arrest for felony or misdemeanor, or even (at common law) merely under civil process. It is probable, however, that even as to preventing escape the officer is justified in taking life only to prevent escape for felony, or where, the offense being a misdemeanor, in resisting force with force his own life is put in peril, and not where he takes life merely to prevent escape of one charged with a misdemeanor. But the officer will be justified in taking life only where he has reasonable ground to believe, and does believe, that it is necessary in making the arrest or preventing escape or defending himself, and the jury must judge of this on the facts."

Counsel for Matthews says:

"There can be no doubt that, if the petitioner had the right to make the arrest, he necessarily had the right to shoot Warren for the purpose of preventing his escape. The right is given to all officers of the army and to soldiers of the army to shoot a deserter who attempts to make his escape."

The statement as to the right of officers and soldiers of the United States army to shoot a deserter in order to prevent his escape is correct. It was so adjudged in the case of In re Fair, supra. But the right there was based upon the rules and orders of the Secretary of War, which Judge Munger said "have the force and effect of the statutory law." Those rules and orders do not undertake to confer any power upon civil officers to make arrests at all—much less, to shoot to prevent escape from arrest. And the statute which does confer power to arrest on civil officers not only does not confer express power to shoot to prevent escape from arrest, but makes no reference to said rules and orders as being applicable to civil officers. I do not care to prejudge this question, and desire to let it remain open; but I must say that I have very grave doubts as to the right of a civil officer to shoot to prevent escape of a deserter whom he is attempting

to arrest, when the deserter is making no attack upon him, and is simply endeavoring to get out of the reach of the officer.

Then, again, if he (Matthews) had a right to shoot to prevent the escape of Warren, in any contingency, it could only have been because he had reasonable grounds to believe, and did believe, that it was necessary to prevent Warren's escape. The prisoner, in his petition, says that Warren resisted arrest and attempted to escape, and "would have effected his escape, had not a member of said posse, in good faith, and without malice, and for the sole purpose of preventing the escape of said Warren, fired his pistol," and that Warren was shot in the leg, and thereby prevented from escaping. The agreed statement of facts says that "the alleged shooting took place in the nighttime, near the residence of Warren's father, on the 15th day of March, 1902. At the time he was fired on and wounded, he was attempting to make his escape from said Matthews, who had gone to the house of his father for the purpose of arresting him as a deserter, aforesaid." It at least seems to come short of saying that there were reasonable grounds for believing, and the shooter actually believed, it was necessary to shoot to prevent escape. None of the witnesses to the affair have testified before me, and I am not in a position to judge for myself. There is, therefore, apart from Matthews' own claim in his affidavit, an absence of a clear showing that the circumstances were such that he had a right to shoot, if under any circumstances he had a right to shoot. What I am asked to do, therefore, is to turn the prisoner loose without out a conviction that the circumstances were such as to justify the shooting.

And lastly, there is a serious question as to whether Matthews was a police officer at all of the city of Somerset, either de jure or de facto. It is agreed, and must be accepted as true, that Matthews claimed and believed himself to be a policeman of said city at the time he attempted to arrest Warren. This may be true, and yet he may not have been a policeman de facto as well as de jure. The facts in regard to his having been a policeman are these: At the regular meeting of the board of council of said city held September 9, 1901, an ordinance was adopted providing that two policeman be employed (one in addition to the present) at pay of $45 per month. After the passage of this ordinance, the chief of police appointed two policemen at a salary of $45 per month, and the board of council consented to this appointment. Thereafter (i. e., whilst this ordinance was in force and said two policeman were acting under said appointment, to wit, on January 13 1902) an order was made by the board of council of said city appointing the prisoner, Matthews, superintendent of streets, with full police powers, at a salary of $45 per month, with instructions to report to the mayor. On the 21st of January, 1902, an entry was made upon the records of the Somerset police court in these words:

"J. B. Matthews, policeman-elect of the city of Somerset, appeared and produced his certificate of appointment as a policeman of the city of Somerset, and took the oath of office as required by law, which is noted of record; and thereupon the said Matthews entered upon the discharge of his duties."

No bond was ever given by Matthews under his appointment. From the date of his taking the oath down to the shooting, Matthews claimed and believed that he was a policeman of the city of Somerset.

Counsel for petitioner claims that Matthews was a policeman under the ordinance of September 9, 1901. Whether so or not, it would seem that he was not appointed policeman under that ordinance. The order of appointment, made January 13, 1902, does not purport to be under that ordinance, and does not appoint him a policeman. It appoints him a superintendent of streets, with police powers. The board of council evidently thought that they had the power, derived from somewhere, to make the appointment of such an officer, and appoint him in pursuance to such supposed authority. There is no indication that it had any idea that the appointment was being made in pursuance to the ordinance of September 9, 1901. The indications are the other way. A policeman and a superintendent of streets, with police powers, are not the same thing. A policeman is a policeman, and nothing else. A superintendent of streets, with police powers, is primarily a superintendent of streets, with something more, to wit, police powers. Besides, evidently it was regarded that the appointment of the two policemen by the chief of police by consent of the city council was a filling of the two positions provided for by the ordinance of September 9, 1901, so that it was not considered that there was any room for the appointment of Matthews to one of said positions.

Section 3492, Ky. St., a part of charters of cities of the fourth class, to which city of Somerset belongs, is in these words:

"The board of council shall have power to appoint a police force, the number, grades and regulations thereof to be provided by ordinance from time to time, whose term of office shall not exceed two years from the date of election, subject to removal for cause."

Section 3506, Ky. St., also a part of said charter, relates to the duties and powers of the chief of police of cities of the fourth class, and is in these words:

"He may appoint a deputy or deputies, by and with the advice and consent of the board of council and special or extra police, by and with the advice of the mayor or chief executive; and said extra or special police appointed for less than a week shall take the oath prescribed by law, but shall not be required to execute bond."

Inasmuch as the two policemen in question, though consented to by the city council, were appointed by the chief of police, it is contended by counsel for petitioner that they must have been appointed under section 3506, Ky. St., and not under the ordinance of September 9, 1901, passed pursuant to section 3492, Ky. St. But the policemen so appointed by the chief of police must be "by and with the advice of the mayor or chief executive," and they are only temporary policemen.

In the case of City of Maysville, v. Purnell (Ky.) 45 S. W. 101, Judge Paynter, in construing these two sections, said:

"The General Assembly was mindful of the fact that on some days or some occasions the regular police force of the city might be insufficient to protect the lives and property of the citizens of the city, or to maintain order and preserve the public peace, or that there might be some special work for a policeman to perform; hence the chief of police, with the advice of the mayor or chief executive of the city, was authorized to appoint extra or special policemen. It was not intended that the chief of police should have the power to appoint regular policemen for the city, because that power is

expressly lodged with the board of councilmen. If the chief of police is vested with the power to appoint whomsoever he pleases on the police force, and place them in the regular police service, then the board of council's effort to appoint the police force, and name the number who shall serve, would be abortive. The board of council is not supposed to be in continuous session, and occasions may arise where it is important that extra or special policemen shall be appointed to serve. Therefore the Legislature thought it wise to vest that power in the chief of police, to be exercised by and with the advice of the mayor or chief executive of the city. The chief of police, as we have said, is not authorized to appoint, with the approval of the mayor, a policeman, and place him in the regular police service of the city."

So that the chief of police of city of Somerset had no power, under section 3506, to make the appointment of said two policemen; and though, under section 3492, the city council had the power of appointment, and not the chief of police, there is certainly room to hold that an appointment made by the chief of police, consented to by the city council, was an appointment by the city council, under section 3492—certainly as much room for holding that as that the appointment of one as superintendent of streets, with police powers, is same as appointment of policeman. So, at the time Matthews was appointed, there is at least good ground for claiming that the policemen provided for by the ordinance had been appointed, and there was no room for Matthews to be appointed to such a place; and it would seem that, whether this was so or not, there was no intention to appoint him to such a position. And it is difficult to see how he could obtain a position to which there was no intention to appoint him by the appointing power. It would seem, therefore, that Matthews' claim to be an officer of the city of Somerset when he attempted to arrest Warren must be based upon the order of January 13, 1902, and power, if any, vested in the city council to make such appointment by the charters of cities of fourth class. I can find no such power, and my attention has been called to none. If there is none, then Matthews could not have been a superintendent of streets, with police powers, de jure. Could he have been de facto such an officer? It is well settled that there can be no de facto officer of an office that does not exist. Mechem, Public Officers, § 324, says:

"So, in the very nature of the case, there can be no officer de facto where no officer de jure is provided by law, or, as is said in one case, 'there can be no officer, either de jure or de facto, if there be no office to fill.' 'Where the law has provided that an office may legally be filled,' says Campbell, J., 'then the acts of an incumbent may be valid, although not lawfully appointed, because the public, being bound to know the law, know that somebody may or should fill the place and perform the duties; and possession would, as to them, be evidence of title. But where the law itself negatives the idea that there can be a legal incumbent, any one assuming to act assumes what every one is bound to know is not a legal office, and his acts cannot be effectual for any purpose.'"

In view of this, it is not necessary to consider question argued by counsel as to right of a de facto officer to arrest deserters and to shoot if necessary.

In the consideration of the question as to whether Matthews was an officer of the city of Somerset when he attempted to arrest Warren, I may at times have expressed positive convictions. It is not my desire to be understood as expressing them. I would rather

be understood as making suggestions. It is my desire to prejudge as little as possible questions that will come up on the trial of the indictment. But to justify my action, I am compelled to give my reasons for so doing. And I think, in view of all the considerations which I have adduced, that I should not interpose at this stage of the proceedings, if ever, and that they should be allowed to take their ordinary course. The state courts are bound to give the prisoner the full benefit of said federal law which he relies on as a justification of his action, and, if they err, their decision is subject to correction by the supreme federal court.

The prisoner, J. B. Matthews, is therefore remanded to the state custody.